**BRANDYWINE–MAIN LINE RADIO, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION,**

**Greater Philadelphia Council of Churches et al., Intervenors.**

No. 71–1181.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1972.

Decided Sept. 25, 1972.

Dissenting Opinion Nov. 4, 1972.

Rehearing Denied Dec. 4, 1972.

Bazelon, Chief Judge, dissented and filed opinion. Wright, Circuit Judge, filed a response in which Tamm, Circuit Judge, concurred.

18

Messrs. Benedict P. Cottone and Eugene F. Mullin, Washington, D. C., with whom Mr. John C. Eldridge, Washington, D. C., was on the brief, for appellant.

Mr. Joseph A. Marino, Associate Gen. Counsel, F.C.C., for appellee. Messrs. Richard E. Wiley, Gen. Counsel at the time the brief was filed, John H. Conlin, Associate Gen. Counsel at the time the brief was filed, and Miss Katrina Renouf, Counsel, F.C.C., at the time the brief was filed, were on the brief for appellee.

Messrs. Thomas Schattenfield, Michael Valder and David Tillotson, Washington, D. C., were on the brief for intervenors.

Before BAZELON, Chief Judge, and WRIGHT and TAMM, Circuit Judges.

TAMM, Circuit Judge:

We hold no freedom more inviolable than our precious first amendment right to freedom of speech. Free and unfettered debate has been a cornerstone of our Republic for almost two hundred years. Any attempt to silence those who would speak, no matter how unpopular their opinions, no matter how controversial their views, must be met with immovable opposition by those who cherish our basic freedoms and hold them dear.

> [T]he peculiar evil of silencing the expression of opinion is that it is robbing the human race; posterity as well as the existing generation; those who dissent from the opinion still more than those who hold it. If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose what is almost as great a benefit, the clearer perception and livelier impression of truth, produced by its collision with error.[1]

This is the setting in which we must consider the dispute arising from the refusal of the Federal Communications Commission (hereinafter "the Commission") to renew the broadcast license of Brandywine-Main Line Radio, Inc. (hereinafter either "Brandywine" or "WXUR") as licensee of radio stations WXUR and WXUR–FM, located in Media, Pennsylvania.[2] Yet, even in light of the extremely high standard which we have set in this case, we must affirm the opinion of the Commission.

## I. FACTUAL BACKGROUND

### A. *Early Operation of WXUR*

Brandywine was licensed to operate WXUR in 1962 by the Commission after a determination that such license would be beneficial in serving the public interest. WXUR–AM is a daytime standard broadcast station while WXUR–FM is a full-time station. The two stations are the sole stations in Media, Pennsylvania. As has been known to happen, Brandywine suffered financial reverses and the stockholders expressed an interest in selling the company in 1964. Contemporaneously, Station WVCH, located in Chester, Pennsylvania (a town which neighbors Media) elected to terminate broadcasting *20th Century Reformation Hour,* the program produced by Dr. Carl McIntire.[3] This event left Rev. McIntire with no outlet for his program in the Philadelphia broadcast market. It is understandable, therefore, that when Dr. McIntire learned that WXUR might be available, the Faith Theological Seminary[4] (hereinafter "the Seminary")

---

1. J. Mill, on Liberty, *quoted in* Buckley v. Meng, 35 Misc.2d 467, 474, 230 N.Y.S. 2d 924, 932 (Sup.Ct.1962).

2. Despite the fact that two stations, WXUR and WXUR–FM, are involved in this suit, any reference to "WXUR" will be employed to designate both the AM and FM frequencies, unless otherwise indicated.

3. Dr. McIntire testified at the hearing for license renewal that:
 > I received notice [from WVCH] informing me the program would be terminated and we made a very great issue of it publicly here and committees were organized to see if it couldn't be continued. The reason given for [cancellation], as given to us, was that it was the advice of the attorneys in Washington in connection with their FCC problems that led them to put me off.

 When asked how he had obtained this information, McIntire continued:
 > It was obtained by a committee that went by the pressures [*sic*] that were built up as to just what was the reason Dr. McIntire was being removed and when we found this difficulty with the FCC or with its attorneys in connection with the FCC, the same problem confronted me as I sought to get on the other stations in the community. When we found that we were virtually blacked out and that our views, our opinions were not going to be aired in the community, we became interested in purchasing a station or being a part of a purchase in some way so that a program such as mine could be aired in the community.

 J.A. Vol. V, 4236–37.

4. Faith Theological Seminary is located in Elkins Park, Pennsylvania, near Phila-

entered into an agreement to purchase Bradywine's stockholders' interests in October, 1964. The Seminary filed an application with the Commission seeking approval for the proposed purchase of Brandywine's stock and for Commission approval for the Seminary's proposed operation of WXUR.

## B. *The Transfer Application*

In its proposal to the Commission the Seminary stated that it would continue the station's general format of broadcasting entertainment, talk shows and short newscasts, and in addition, two one-hour religious programs would be broadcast each weekday;[5] the station would also broadcast religious programs until noon on Sunday.[6] The terms of the Seminary application sought Commission permission to operate "for the principal purpose of broadcasting the Gospel of our Lord and Saviour Jesus Christ, for the defense of the Gospel, and for the purposes set forth in the Charter of Incorporation." This application was not without opposition, however, as some fifteen community groups and a number of individuals and churches within the community made their opposition known to the Commission.[7] The Commission noted that it also received communications from many individuals and churches who were proponents of the transfer. As the Commission noted "[t]he complaints [opposing the transfer application] are based on

the relationship to the transferee of the Reverend Carl McIntire, President of the Board of Directors of Faith Theological Seminary, Inc." [8]

The major concern of the opponents to the transfer was that the station would be incapable of providing for a balanced presentation of opposing views in light of McIntire's connection with the Seminary and in view of his radio programs and publications.

The main thrust of the complaints concerning Rev. McIntire, is that, in his radio programs and publications, he has made false and misleading statements and deliberate distortions of the facts relating to various public issues such as race relations, religious unity, foreign aid, etc.; that he has made "intemperate" attacks on other religious denominations and leaders, various organizations, governmental agencies, political figures and international organizations; and that such expressions are irresponsible and a divisive force in the community and help create a climate of fear, prejudice and distrust of democratic institutions. It is also alleged that, in light of his record of "partisan and extremist" views on various public issues, he lacks the degree of social and public responsibility demanded of broadcast licensees and that these views will carry over into the operation of the stations in view of his con-

delphia. Reverend McIntire presided over the Seminary's Board of Directors at the time the offer to purchase Brandywine was tendered.

5. These two programs were *Missionary Hour* and *Gospel Hour*.

6. The Sunday morning programs were entitled: *It's Sunday Morning, Dedication, The Church at Work, Men's Hour, Church Service* and *Sunday U.S.A.*

7. The following groups and individuals were among those opposed to the transfer application: the Greater Philadelphia Area Committee for UNICEF, the National Association for the Advancement of Colored People, the Anti-Defamation League of B'nai B'rith, the Pennsylvania

Southeast Conference of the United Church of Christ, the Presbytery of Philadelphia, the National Urban League, the Greater Philadelphia Council of Churches, the Jewish Community Relations Council, the New Jersey Council of Churches, the Philadelphia Council of the AFL–CIO, the American Baptist Convention, the Eastern Pennsylvania Synod of the Lutheran Church in America, the Philadelphia Baptist Association, and the Executive Committee of the Catholic Interracial Council of New York.

8. In re Application of George E. Borst, et al., 4 P & F Radio Reg.2d 697, 698 (March 19, 1965) (hereinafter "Borst Decision").

nection with the transferee. It is alleged, finally, that a serious question is thus raised, in light of his views, whether he is or will be able to bring about a balanced presentation of opposing views or whether he will place his personal views above the station's public interest obligations.[9]

While the applications for transfer were still pending, the Commission communicated with the Seminary with regard to various aspects of the application and with particular interest as to whether station "facilities would be available to other faiths for the presentation of religious programs, and, if so, under what conditions or circumstances." The Seminary responded by filing an amendment to the original application which included an exhibit which stated the Seminary's intent to "make time available on an equal and non-discriminatory basis to all religious faiths requesting time for the presentation of religious programs."[10] To further insure balance in the area of religious broadcasting the Seminary's amendment provided for a half-hour program on Sunday to be known as *Interfaith Forum*.[11]

## C. *Commission Approval of Transfer*

The Commission's Memorandum Opinion and Order[12] granting the transfer application was forthcoming on March 19, 1965.[13] This opinion, known as the *Borst Decision,* summarized the nature of the complaints received[14] opposing the Seminary's application. The Commission continued by expressing that, as a matter of policy,

> [t]he Commission is wisely forbidden from choosing "among applicants upon the basis of their political, economic or social views . . ." As Mr. Justice Douglas stated:
>
> "The strength of our [broadcasting] system is in the dignity, resourcefulness and the intelligence of our people. Our confidence is in their ability to make the wisest choice. That system cannot flourish if regimentation takes hold."[15]

The Decision noted that Dr. McIntire represented that his relationship with WXUR would be as that of a broadcaster and that management decisions would be left to three other members of the Seminary's Board who would constitute the Board of Brandywine.[16] Despite all

---

9. *Id.* at ¶ 2.

10. J.A. Vol. II, 120–27.

11. The amendment described *Interfaith Forum* as a program in which ministers or representatives of different faiths will be invited to participate in roundtable discussions of religious principles and tenets as related to current social problems. Every effort will be made to obtain varied participation from week to week to assure the greatest possible balance of views on the subjects of discussion.
J.A. Vol. II, 127.

12. *Supra,* note 8.

13. The Commission was not unanimous in its action. Commissioner Hyde concurred in the result only. Commissioner Cox dissented in the belief that the application should have been designated for a hearing. Commissioner Loevinger concurred, especially expressing his displeasure with the Commission's action in concerning itself with McIntire's views.

14. *See* text at note 9, *supra.*

15. Borst Decision, *supra,* at ¶ 3. Citations omitted.

16. *See* letter of Carl McIntire to E. William Henry, Chairman of the Federal Communications Commission. In this letter Rev. McIntire stated:

> It is constantly being alleged that I am buying the station. You know, of course, that it is the corporation of the Seminary of which I am a member and am presently the president of the corportion. . . . I want you to know that I have no financial interest in any way in this sale. Moreover, I own no radio station and have no financial interest in any radio station in the country or anywhere else.

J.A. Vol. II, 140. While Rev. McIntire was not the president of the Seminary he did list a large number of other associations on the transfer application. He is listed as Pastor of the Bible Presbyterian Church of Collingswood, New Jersey; President of the Board of Trustees of Shelton College, Cape May, New Jersey; Vice-President of Independent Board of Presbyterian Foreign Missions; Presi-

of this the Commission did consider the basic fear of the application's opponents that the station would be under Dr. McIntire's influence and that it would not give full and fair treatment to divergent views on controversial issues as required by both standards of public interest and the Commission's fairness doctrine.[17] The Commission's ultimate conclusion was that a hearing on the transfer application was unnecessary because of the in-depth representations, contained in the application, to fully comply with the station's acknowledged obligations in the fairness arena.[18]

The *Borst Decision* went to great lengths to reinforce and reiterate the transferee's duties and obligations under both the fairness doctrine and the personal attack corollary. The Commission took notice of Brandywine's written submission that equal opportunity would be afforded to opposing viewpoints on controversial public issues [19] but nonetheless felt constrained to

> [s]pecifically direct attention to our ruling in Cullman Broadcasting Co., FCC 63–849 [requiring presentation of conflicting views at licensee expense if advocates willing to pay for broadcast time cannot be found] and to our personal attack principles (see *Public Notice of July 1, 1964, Applicability of the Fairness Doctrine, Part E*) the licensee is required to operate in accordance with these requirements, and unless immediately informed to the contrary, we take the licensee's representation to encompass these requirements.[20]

The Commission expressed the view that Dr. McIntire's record of offering free response time for either an opportunity to debate some issue or respond to some attack "[would] not suffice to discharge the fairness responsibilities of

---

dent, Christian Beacon Press, Inc., Collingswood, New Jersey; President and editor of the Christian Beacon; and member of the Board of Directors of Highland College, Pasadena, California.
Borst Decision, *supra*, at fn. 2.

17. The fairness doctrine has been codified at 47 U.S.C. § 315 (1970).

18. Question 7 of the Broadcast Application (Statement of Program Service of Broadcast Applicant) requires the applicant to make
". . . a narrative statement on the policy to be pursued with respect to making time available for the discussion of public issues, including illustrations of the types of programs to be broadcast and the methods of selection of subjects and participants.
Faith Theological Seminary responded in the following terms: "Equal opportunity will be afforded to opposing viewpoints on controversial public issues." J.A. Vol. II, 111.
In the Commission Statement of AM or FM Program Service question 16 inquires:
In connection with the applicant's proposed public affairs programming describe its policy with respect to making time available for the discussion of public issues and the method of selecting subjects and participants.

The Seminary replied by stating:
Opportunity on equal terms to opposing viewpoints on controversial public issues. Subjects will not be selected by station but will be those either presented by sponsors or by members of listening audience calling in on "Freedom of Speech" program. Replies to controversial views expressed on sponsored programs will be by spokesmen equally qualified as spokesmen on sponsored program.
J.A. Vol. II, 138.
Finally, consider the following from the above form:
29. State the methods by which applicant undertakes to keep informed of the requirements of the Communications Act and the Commission's Rules and Regulations, and a description of the procedures established to acquaint applicant's employees and agents with such requirements and to ensure their compliance.
Employees are required to be familiar with FCC rules applicable to their duties. Copies of FCC rules are kept at station. FCC notices are posted on bulletin board. Washington counsel is consulted on doubtful questions.
J.A. Vol. II, 139a.

19. *Id.* at 138.

20. Borst Decision, *supra*, at ¶ 8, fn. 2a.

a licensee carrying the broadcasts in question."[21]

The Commission made every effort to assuage the fears of Brandywine's opponents that WXUR would become a medium over which McIntire could express his personal views to the exclusion of the views of the listening public. The Commission reprinted the following detailed programming promise from the Brandywine application:

It will be the policy of the transferee to make time available on an equal and nondiscriminatory basis to all religious faiths. . . . In other words, the same terms and conditions will be applicable to all faiths . . . as will be applicable to the religious faith . . . [of] the transferee. . . . It will be the policy to make time available to religious faiths equally. . . . However, . . . a half hour will be available and utilized on Sundays . . . for an Interfaith Forum program, in which ministers or representatives of different faiths will be invited to participate in round-table discussions of religious principles and tenets as related to current social problems.

Every effort will be made to obtain varied participation from week to week to assure the greatest possible balance of views on the subjects of discussion. The transferee will invite the cooperation of recognized ministerial associations in the Greater Philadelphia area to present their recommendations as to participants and subjects of discussion on this program and in the event of failure to obtain such cooperation, the transferee will extend invitations to, and make sincere efforts to obtain participation by,

individual churches and faiths in a manner which will assure, to the fullest extent possible, fair and equal representation of varying views.[22]

The Commission granted Brandywine's application for transfer with one final warning to the Seminary broadcast group.

In reaching this determination, we have relied upon the specific representations by the transferee indicating awareness of a licensee's responsibilities. In any event, this grant is subject to the same conditions applicable to all broadcast grants . . . [including, among itemized conditions] . . . that [Brandywine] will abide by the requirements of the fairness doctrine (see [Fairness Primer]).[23]

The new management began broadcast operations on April 29, 1965.

## D. *The License Period*

Brandywine's initial license period ran from April 29, 1965, through August 1, 1966.[24] It is important for this court to examine WXUR's operations during this period as these operations are the actual predicate of the action before us.

When the new management group assumed broadcast control on April 29, 1965, they began making substantial changes in the station's program format, despite the fact that these changes were not indicated in the proposed program format as presented by the Seminary in the transfer application. In addition, one of the programs on which the Commission placed the greatest reliance in granting the application, *Interfaith Dialogue,* did not first appear on WXUR until November 28, 1965, some seven months after the Seminary assumed control of the station.[25] The Commission

---

21. *Id.* at ¶ 8, fn. 3, *citing* Report on "Living Should Be Fun" Inquiry, 33 F.C.C. 101, 107 (1962).

22. *Id.* at ¶ 9.

23. *Id.* at ¶ 10.

24. In re Applications of Brandywine-Main Line Radio, Inc. for renewal of licenses of Stations WXUR and WXUR–FM,

Media, Pennsylvania, 9 P & F Radio Reg.2d 126 (1967) (hereinafter "Designation Order").

25. With reference to *Interfaith Dialogue* the Commission made the following observation:

Not only was the program not put on at all for almost seven months, but

enumerated a partial listing of programs which did appear in the early license period although not included in the Seminary's amended "Typical Program Schedule." On May 3, 1965, WXUR broadcast *Lifeline* and *Manion Forum; Behind the Headlines* on May 4, 1965; *Howard Kershner's Commentary* on May 5, 1965; *Independent Americans* on May 6, 1965; *The Dan Smoot Report* on May 7, 1965; *Church League of America* on May 8, 1965; and *Christian Crusade* on June 14, 1965.[26] In this regard, it is interesting to note the admission by John H. Norris, the station's manager, that "as soon as the F.C.C. said that . . . [the Seminary] could take the Station over," he commenced making arrangements for broadcast of the above programs.[27] All of these programs shared one common characteristic: they were devoted almost solely to coverage and discussion of viewpoints on controversial issues of public importance. Personal attacks on the honesty, integrity and character of both groups and individuals were, unfortunately, not infrequent.[28]

Seven months after the Seminary commenced operation of WXUR, the station was the subject of public condemnation by the Media Borough Council [29]

---

when it was, Brandywine patently failed to carry out the important promise to "make every effort" to get a varied participation. The moderator of the first broadcast was Norris himself. His guests were his pastor from York, Pennsylvania, the Reverend Albany, and George McDonald, a fellow trustee of the American Patriotic News organization. (Tr. 3635–3636.) From the second broadcast on December 5, 1965, through April 1966, the moderator was Seminary faculty member Dr. Gary Cohen. (Tr. 5480, 5596.) On the second (December 5, 1965) broadcast of Inter-faith Dialogue, Dr. Cohen interviewed William Broadwick, an engineer at WXUR and a Seminary student. (WXUR Exh. 49A, Tr. 5514–5519.) Cohen interviewed Broadwick again on the third (December 12, 1965) broadcast. (*Ibid.*) On the fourth (December 19, 1965) broadcast, Cohen interviewed Donald Carpenter, another Seminary student (*Ibid.*), and on the fifth broadcast Cohen interviewed the Reverend A. Franklin Faucett, the Seminary's Registrar. (*Ibid.*) None of these broadcasts complied with the Seminary transfer application representation that the program would consist of "round-table" discussions by representatives of "different faiths." (Appendix D; Bur.Exh. 5.) From that time on, although not as completely taken up by Seminary people, the program clearly did not live up to its promise. The Examiner found it woefully inadequate, and we agree.

In Re Applications of Brandywine-Main Line Radio, Inc. for Renewal of Licenses of Stations WXUR and WXUR–FM, Media, Pennsylvania, 24 F.C.C.2d 18, 29 (1970) (hereinafter "July Decision").

26. *Id.* at ¶ 30. The Commission continued by stating:

These programs, covering controversial issues as they do, are not merely changes in title from the programs deleted from the schedule, which mainly included programs classified as of the "entertainment" type. We may assume that the applicant failed to include these programs because of the opposition to its application, erroneously believing that the inclusions would have affected our action. *What is important to us is the willingness to withhold from us the Seminary's intentions with respect to a substantial amount of programming, for it is clear that the intention to carry the programs predated the acquisition of control and we were never informed of it.*

*Id.* (emphasis added, footnote omitted).

27. Tr. 3727–28. This is despite the directly contradictory evidence offered by Norris some five weeks earlier to the effect that the new programs, which he termed the "Nine Hate Clubs" of the air, were added by him *in anticipation* of a sponsors' boycott. This was not the only inconsistency of the record and is, in fact, one of the less serious discrepancies before us. July Decision, *supra,* at 31.

28. *See generally* Initial Decision of Hearing Examiner, 24 F.C.C.2d 42, 106 (1970) (hereinafter "Initial Decision").

29. The Minutes of a meeting held on November 18, 1965, of the Media Borough Council, reflect the following:

Mrs. Austin protested to Council about a program on WXUR, which she feels promotes hate and dissension by attacking minority groups. This program is called "Freedom of Speech". She considers this a malicious act and

and the House of Representatives of the Pennsylvania General Assembly.[30] The Seminary's Broadcast Board attempted to soothe some of the ruffled nerves created by the *Freedom of Speech* program,[31] and continued its attempts at rehabilitating the station's image by introducing *Inter-Faith Dialogue,* promised in the January 1965 amendment to Brandywine's transfer application, on November 28, 1965.[32]

WXUR was required to file its renewal application by early May, 1966. They were sent the necessary "renewal packet" early in 1966 by the Commission. At this time WXUR was also continuing to receive more specific communications from the Commission relating to complaints it had received from individuals, community groups and local governmental bodies. The record discloses that WXUR made attempts at this time to once again enhance its public image by attempting to produce several programs containing contrasting viewpoints on controversial issues of public impor-

---

a disgrace to the citizens of Media.

Mr. Reed stated that a letter should be written to the Federal Communications Commission.

On motion of Mr. Baker, seconded by Mr. Loughran, a letter be written to the F.C.C. about this allegedly biased program of radio station WXUR. So ordered.

J.A. Vol. II, 145e.

The program which caused this furor was entitled *Freedom of Speech,* moderated by Thomas Livezey. *Freedom of Speech* was a telephone call-in show where Livezey would begin the program by reading a newspaper article or an editorial or by making a short statement and then opening the microphones to people calling in. Livezey frequently made "race baiting" comments on the air and was particularly livid in his comments regarding minority groups. Livezey often cut callers off abruptly when they opposed a position which he espoused. On November 24, 1965, Howard F. Reed, Jr., Solicitor, Borough of Media, sent a communique to Commission Chairman Henry on behalf of the Borough Council. In this letter he expressed the concern of the Council with regard to *Freedom of Speech* and commented:

> Within the context of free speech, we do, . . . believe that any radio program inviting the general public to respond by telephone should receive *with equal treatment* all calls placed. We do believe that without some regulation by the Commission, this type of radio program, which is somewhat widespread in its use, can become deceptive, in fact tend to invite controversy unnecessarily, and derogate free speech; most of all, because any program of this type must necessarily involve controls and limitations not inherent in other media of communication, nor so open to public hearing.

J.A. Vol. II, 145f.

On November 19, 1965, one day after the Media Borough Council resolution was passed, Livezey was removed from his position as moderator of *Freedom of Speech.* At a meeting of the Council held on January 20, 1966, a motion was made, following a presentation by representatives of WXUR, stating that "a letter be sent to the F.C.C. stating that the objectionable features of [*Freedom of Speech*] have been largely eliminated." J.A. Vol. II, 145g. A letter to that effect was sent to the F.C.C. by Solicitor Reed on February 2, 1966.

J. A. Vol. II, 145h.

30. The matter of WXUR's broadcasting policy was brought before the House of Representatives of the Pennsylvania General Assembly in the form of House Resolution 160 on December 14, 1965. In pertinent part the Resolution stated that

> [t]he only issue is whether the Reverend McIntire exercises the degree of social and public responsibility which the law demands of a broadcast licensee. There is a serious question whether Radio Station WXUR, under the operational control of Reverend McIntire, is giving the balanced presentation of opposing viewpoints required of broadcast licensees; therefore be it

> RESOLVED, That the House of Representatives of the Commonwealth of Pennsylvania requests the Federal Communications Commission to investigate Radio Station WXUR, in Media, Pennsylvania to determine whether or not it is complying with the requirements of a broadcast licensee; and be it further

> RESOLVED, That a copy of this resolution be sent to the Federal Communications Commission.

J.A. Vol. II, 145a & b.

31. *See* note 29, *supra.*

32. J.A. Vol. II, 209.

tance. Each of these programs were carefully detailed in Brandywine's renewal application filed May 3, 1966.[33] That application would have, if granted, provided Brandywine a license for a three-year period from August 1, 1966, through July 31, 1969. Based on Brandywine's operating record from March 17, 1965, through the May 3, 1966, filing date, nineteen parties opposed the renewal application and urged the Commission to deny Brandywine's application.[34] This opposition was in the form of a joint pleading filed with the Commission on July 19, 1966.

After considering the submissions of the parties the Commission found that substantial questions did exist as to

> whether the applicant has met the conditions set forth in the Commission's . . . [Transfer Order] . . . during its license period from April 29, 1965 to August 1, 1966; . . . whether the applicant fully and candidly advised the Commission of its program plans in connection with its [transfer] application . . . ; the applicant's efforts to comply with the Commission's Fairness Doctrine, including the personal attack principle; and . . . whether the applicant has used the facilities of its stations to serve the sectarian and political views of its principals and to raise funds for their support rather than to serve the community generally, and whether this was misrepresented to the Commission in its application for acquisition of control of these stations. In the latter connection, the Commission notes the charges that the applicant has operated stations WXUR and WXUR-FM, as a divisive force in the community by disparaging racial and religious groups and by castigating and vilifying persons and groups espousing views on public controversial issues different from those of the applicant.[35]

The Commission adopted a number of issues for hearing of which four remain pertinent to these proceedings:

- To determine whether the applicant failed to inform the Commission fully of its program plans in connection with its application for acquisition of control of Stations WXUR and WXUR-FM;
- To determine whether the applicant has complied with the Fairness Doctrine and Section 315 of the Act by affording a reasonable opportunity for the discussion of conflicting views on issues of public importance during its license period;
- To determine whether during its license period the applicant has complied with the personal attack principle of the Fairness Doctrine by furnishing copies of pertinent tapes, continuities or summaries to persons or groups attacked, with spe-

33. J.A. Vol. II, 207–33.

34. The challengers were the AFL–CIO of Pennsylvania, the American Baptist Convention Division of Evangelism, the Delaware Valley Council of the American Jewish Congress, the Anti-Defamation League of B'nai B'rith, the Board of Social Ministry of the Lutheran Synod of Eastern Pennsylvania, B'rith Sholom, the Catholic Community Relations Council, the Catholic Star Herald, the Fellowship Commission, the Greater Philadelphia Council of Churches, the Jewish Community Relations Council of Greater Philadelphia, the Jewish Labor Committee, the Media Fellowship House, the Media Chapter of the NAACP, the New Jersey Council of Churches, the Philadelphia Urban League, the U.S. Section of the Women's International League for Peace and Freedom, the American Jewish Committee, and the Rev. Donald G. Huston, Pastor, First Presbyterian Church of Lower Marion.
In addition, various persons and organizations, viz., the Greater Philadelphia Branch of the American Civil Liberties Union, the House of Representatives of the General Assembly of Pennsylvania, the Unitarian Church of Delaware County, the Pennsylvania Council of Churches and the Media Borough Council, wrote the Commission "requesting an investigation of, or hearing on Brandywine's programming." July Decision, supra, at ¶ 1, fn. 3.

35. Designation Order, supra, at ¶ 4.

cific offers of the stations' facilities for responses, where discussions of controversial public issues have involved personal attacks;

· To determine whether the applicant in connection with its application for transfer of control of Stations WXUR and WXUR-FM misrepresented to the Commission its program plans.[36]

The Commission designated the WXUR renewal application for hearing stating that it was

unable to determine that a grant of these renewal applications would serve the public interest, convenience, and necessity. In order to insure that a full record is made detailing all perti-

nent and relevant facts concerning the applicant's operations of stations WXUR and WXUR-FM and its representations concerning such application, an evidentiary hearing is required.[37]

## E. *The Hearing*

Hearing Examiner H. Gifford Irion called the evidentiary hearing to order on October 2, 1967, in Media, Pennsylvania.[38] The hearings recessed for over three months on December 15, 1967, after the bulk of the Intervenor's and Broadcast Bureau's evidence had been submitted, to allow Brandywine to prepare its case. The Brandywine presentation began on March 20, 1968.[39]

---

36. *Id.*

37. *Id.*

38. The transcript reveals that WXUR undertook additional palliative measures on this date by introducing a new program entitled *Right, Left and Center* on its FM frequency. The program, which was designed to show left, right and middle-of-the-road philosophies, lasted only a short time. The Commission did not consider the program, nor will this court, since it did not commence for more than a year after the license renewal issue arose and was thus *totally* outside the license period. *See* J.A. Vol. V, 2529–32.

39. The court must comment on the conduct on Brandywine's counsel, Mr. Cottone, during the course of the hearing. We comment because his behavior, on more than one occasion during the course of the hearing, was injudicious, rude, impudent and directly obstructive to the proceedings before the examiner. The record before the court is replete with one instance after another of obstreperous behavior on Mr. Cottone's part. A few examples from the record will suffice.

> BY MR. SCHATTENFIELD:
> Q: I will show you what has been marked for identification as Intervenor's Exhibits 77 and 78 and ask you if they embody the positions you have taken with respect to UNICEF.
> MR. COTTONE: Object. Let him identify them first. I object to the question.
> MR. SCHATTENFIELD: Can I finish the question?

> PRESIDING EXAMINER: Mr. Cottone, let him finish. We can move along faster if you stop the useless interruptions.
> MR. COTTONE: I resent you stating "useless interruptions"; I have a right to raise evidentiary objections as I see fit. If you do not understand the objections, that is another point.
> PRESIDING EXAMINER: I can't rule on them unless I know what the question is.
> J.A. Vol. V, tr. 4383–84.
> MR. COTTONE: Let the record show when that remark was made by the Hearing Examiner, there was a moan from the audience.
> PRESIDING EXAMINER: I am trying to get along without these perpetual interruptions. The witness has been handling himself well in giving a lucid account of everything and a forthright account. Could we go forward with the questions and answers. I sustain the objection. Let us not go over the pamphlets again.
> MR. COTTONE: Now may I look at them?
> MR. SCHATTENFIELD: What?
> MR. COTTONE: May I look at them now?
> MR. SCHATTENFIELD: Are you implying I didn't give them to you before?
> MR. COTTONE; No; I said, before, I didn't want to look at them, but now may I look at them?
> J.A. Vol. V, tr. 4387–88.
> MR. SCHATTENFIELD: Did you ever take any position with respect to the Panamanian Treaty?

The record of the hearings closed on June 26, 1968, after a compilation of a nearly 8,000 page record and several hundred exhibits.

### F. *The Initial Decision*

Hearing Examiner Irion released his Initial Decision on December 13, 1968. This very lengthy examination of the case [40] was most thorough with regard to findings of fact, however, the high quality of fact finding led the examiner to only irrational conclusions and findings of law. Intervenors have termed this decision "a whitewash of Brandywine's performance as a licensee"[41]—this court must concur in that assessment. Several examples will make this clear.

▮ 1. *Presentation of Contrasting Viewpoints on Controversial Issues.* Hearing Examiner Irion found that WXUR should be excused from complying with the fairness doctrine because of the small staff retained by the station. Secondly, he found that programming on WXUR was balanced by the programming of other licensees in the Philadelphia market. Both of these conclusions are clearly erroneous. The fairness doctrine applies to *all* licensees, while area wide programming is not a valid consideration in determining whether a licensee has complied with the fairness requirements. *See* Green v. F. C. C.[42]

2. *Personal Attack Violations.* The Examiner made numerous findings against WXUR for failure to comply with the personal attack principle of the fairness doctrine. However, his conclusions fail to recommend any sanctions for these numerous violations. It is not necessary for this court to prepare a line-by-line analysis and refutation of the Examiner's decision; nor would it be prudent for us to do so as the Commission has issued its own detailed opinion reversing the Examiner. Nonetheless we are sufficiently disturbed by the Examiner's final conclusion to pause for a moment to reflect and comment. Examiner Irion concluded by saying:

> Thus the decision must be shaped by ultimate objectives rather than by isolated instances of error. This will not be an invitation to carelessness or disregard of the ethical principles involved in the personal attack rules since punishment by forfeiture will always await the transgressor but, in the unusual circumstances of this case, Draconian justice is inadvisable.[43]

It is clear to this court, as it was to the Commission, that the Examiner began his herculean opinion by determining both his conclusion and ultimate disposition of this case. Rather than suiting his conclusions to "let the punishment fit the crime", he chose to adopt a benevolent stance ill-suited to the facts in this case. The *Initial Decision* allows appearance to tyrannize over truth. The facts surrounding Brandywine's operation of WXUR are neither so pliant nor sufficiently malleable to allow for the conclusions of the Examiner.

---

MR. COTTONE: Pandemonium treaty?
MR. SCHATTENFIELD: I was not referring to you, Mr. Cottone.
MR. COTTONE: That is clever, but please tell me what you said.

J.A. Vol. V, tr. 4396.
Perhaps Mr. Cottone's actions can be explained as "performing" for the hometown crowd. However, the court will not mute itself to such popcorn and peanuts antics, designed to create a circus-like atmosphere, which would permeate the proceedings. The attitude displayed by counsel borders on the contemptuous and we therefore refuse to let it go unnoticed.

40. The *Initial Decision* was 97 pages long. It contained 275 paragraphs of findings and 54 paragraphs of conclusions.

41. Brief for Intervenors at 12.

42. Green v. F.C.C., 144 U.S.App.D.C. 353, 447 F.2d 323 (1971), wherein this court stated: "that a licensee charged with violation of the Fairness Doctrine may [not] seek absolution by reference to compliance with it by other licensees." Through some stroke of the imagination Brandywine cites the *Green* decision to the court for exactly the opposite proposition.

43. Initial Decision, *supra*, 24 F.C.C.2d at 139.

The opinion did contain a number of findings adverse to Brandywine; however, the licensee failed to file exceptions as to any of these matters.[44] Both intervenors and the Broadcast Bureau of the Commission filed extensive exceptions.

### G. *The Commission's Decision*

The Commission refused to adopt the Hearing Examiner's *Initial Opinion* and adopted its own opinion on July 7, 1970 in which it denied the licensee's application for renewal after an independent review of the record. In its review the Commission drew adverse conclusions with reference to Brandywine's compliance with the fairness doctrine,[45] compliance with the personal attack principle,[46] and also with reference to the manner in which Brandywine misrepresented its program plans to the Commission.[47] Let us examine the Commission's reasoning in each area separately.

### 1. *The Fairness Doctrine*

The fairness doctrine was, in the Commission's view, the central aspect of the litigation. The reason for this is axiomatic—prior to issuing Brandywine's initial license a tremendous amount of concern was expressed to the Commission by numerous parties, each fearing that WXUR would fail to comply with the doctrine. Brandywine's response to these fears was clear and apparently forthright—it had promised at the time of the transfer application to fully comply with the doctrine.[48] In point of fact, the decision of the Commission had "reiterated the necessity that a licensee serve the public interest by adherence to the Fairness Doctrine, including the personal attack principle."[49]

The Commission proceeded to review the record, including fifteen days of monitored broadcasts,[50] and concluded "that Brandywine under its new ownership did not make reasonable efforts to comply with the Fairness Doctrine during the license period."[51] The Commission discovered, as a result of studying the submissions based on the monitored periods, that WXUR had failed to comply in a number of instances in which one side of an issue was broadcast

during these periods without presenting any opposing viewpoints on any but one of these issues, and with an insignificant presentation on that issue, despite the fact that such controversial issue programming was a substantial part of WXUR's total programming.[52]

Additionally, the Commission found that WXUR had failed to affirmatively come forth with the requisite responsive evidence necessary to illustrate Brandywine's efforts to assure compliance with both the fairness doctrine and the personal attack principles, as promised in the initial transfer application. The Commission found that:

Brandywine failed to establish any regular procedure for previewing,

---

44. Section 1.277 of the Commission's Rules and Regulations requires that exceptions be taken from adverse findings to preserve any objections on appeal.
 (a) Each exception to an initial decision or to any part of the record or proceeding in any case, including rulings upon motions or objections, shall point out with particularity alleged errors in the decision or ruling and shall contain specific references to the page or pages . . . on which the exception is based. *Any objection not saved by exception pursuant to this section is waived.* . . .
 47 C.F.R. § 1.277(a) (1972) (emphasis supplied).

45. July Decision, *supra*, at ¶¶ 8–14.

46. *Id.* at ¶¶ 18–22.

47. *Id.* at ¶¶ 23–32.

48. *See* pp. 22–23, *supra*.

49. July Decision, *supra*, at ¶ 8.

50. After receiving a large number of complaints from listeners about alleged programming abuses, the Broadcast Bureau monitored broadcasts on WXUR for eight consecutive days in the middle of the license period. The intervenors taped seven other consecutive days, also during the license period.

51. July Decision, *supra*, at ¶ 9.

52. *Id. See also* Appendix A to the July Decision, *supra*.

monitoring or reviewing its broadcasts, and thus did not regularly know what views were being presented on controversial issues of public importance. Despite the *prima facie* evidence presented by the other parties on this issue, Brandywine did not respond with any further review of its treatment of such controversial issues, either for the full license period or any smaller reasonable segment of time. Furthermore it made no showing of public announcements inviting the presentation of contrasting views at the times the issues in Appendix A (or others) were discussed, nor of any other adequate action to encourage the presentation of contrasting viewpoints on these issues.[53] Brandywine relies upon certain call-in and interview programs as meeting its fairness obligations. However, our review of the record shows that these programs were inadequate to this purpose because they either were not directed at obtaining opposing views on the issues (*i.e.*, speakers were not secured or presented in connection with these issues), or were so conducted as to discourage the presentation of views not shared by their moderators.[54]

WXUR contended that Rev. McIntire had undertaken substantive efforts to assure compliance with the fairness doctrine. This submission took the form of letters which evidenced unaccepted invitations to appear on the *20th Century Reformation Hour*. The Commission rejected this would-be indicia of compliance since "these were not invitations by the licensee and, more important, they do not constitute adequate invitations to present contrasting views on the issues set forth in Appendix A."[55] Similarly, the Commission rejected the suggestion that the licensee's fairness obligations could be met by the existence of a daily one-hour call-in program, entitled *Freedom of Speech*, on which a listener could comment briefly on any topic he wished.[56] "On the contrary," the Commission stated, "its operation demonstrates a failure to provide a fair forum by a licensee specifically on notice of its responsibilities in the fairness area."[57] This was especially true since, from the inception of the program until the replacement of Thomas Livezey as moderator, after the adverse resolution of the Media Borough Council,[58] the program

> was conducted so as to discourage viewpoints with which [the moderator]. disagreed. From the outset he both cut off and insulted callers who did not share his views. This conduct, for which Brandywine is of course responsible, is patently inconsistent with the requirement of fairness.[59]

Likewise, the Commission rejected two other daily programs as examples of efforts to provide the required balance. The first of these was *Delaware County Today* [60] on which the moderator dealt with those opposed to his views by "rough[ing them] up" and by "forc[ing them] to give their views in an antagonistic setting."[61] The second program on

---

53. We believe that remedial action subsequent to the time when Brandywine's renewal was put in doubt is not entitled to weight. See Immaculate Conception Church of Los Angeles v. Federal Communications Commission, 116 U.S.App. D.C. 73, 320 F.2d 795, cert. denied, 375 U.S. 904, 84 S.Ct. 196, 11 L.Ed.2d 145. (Footnote renumbered).

54. July Decision, *supra*, at ¶ 10.

55. July Decision, *supra*, at ¶ 11. *See* particularly fn. 9 for the reasons that these invitations were viewed as being inadequate.

56. *Id.*

57. *Id.*

58. See p. 24, *supra*.

59. July Decision, *supra*, at ¶ 11.

60. A daily interview program which lasted from 30 to 45 minutes a day.

61. July Decision, *supra*, at ¶ 12. The Commission specifically rejected the Examiner's contention that WXUR should be given credit toward balance for invitations extended on this program, but refused, by those fearing to be "roughed up." *Id.*

which WXUR sought to rely was *Radio Free Philadelphia*.[62] The commencement of this program was shortly after Brandywine filed its renewal application with the Commission and shortly prior to the filing of the petitions to deny. Therefore, the program had a very brief period of relevance to this proceeding.[63]

The Commission indicated that a detailed discussion of these programs and issues was necessary

both because they are critical to resolution of the fairness issue in this case and because the Examiner neither tied his view that WXUR had put on all shades of the political spectrum to the station's treatment of particular controversial issues nor made a distinction between the pre- and post-renewal date programming. *We are not concerned with the social, political, or religious philosophy of the licensee or any person using its facilities.* Our interest is in the right of the public to a reasonable opportunity to hear contrasting views on controversial issues; whether this right has been accorded by the licensee can be determined only in the context of issues, not by generalized political labels. In the face of particular attention being drawn to the necessity for fairness at the time control of the station was transferred, the record shows no reasonable attempt to meet the station's obligations in this area. See Editorializing by Broadcast Licensees, 13 FCC 1246 (1949).[64]

The Commission refused to give weight to the Examiner's conclusion that

WXUR's small staff in some way exculpated the station for its failure to achieve balance in fairness.

The objective of the Fairness Doctrine is to protect the listeners' right of access to information about all sides of controversial issues of public importance. No showing has been made of inability to comply with fairness requirements because of financial limitations.[65]

The Commission was also unmoved by Brandywine's "alleged delegation of Fairness Doctrine responsibilities to the sponsors or producers of the programs it broadcast. (Tr. 7874–75)."[66]

Fairness Doctrine responsibilities may not be delegated. Editorializing by Broadcast Licensees, 13 F.C.C. at 1248; see also "Living Should Be Fun," 33 F.C.C. 101, 107 (1962) . . . . [T]he ultimate responsibility for compliance with the Fairness Doctrine rests with the licensee. Norris [the General Manager] must have known this if he understood the Doctrine as thoroughly as he claimed. (See Tr. 1664–65 and 1880–82.) In any event, we have not found that any delegee adequately performed these functions.[67]

The Commission concluded its consideration of this topic by finding that Brandywine "was indifferent to its affirmative obligation 'to encourage and implement the broadcast of all sides of controversial public issues' (paragraph 9, Editorializing by Broadcast Licensees,

---

62. This program commenced in May 1966 and appeared twice each week. Brandywine has failed, however, to indicate when relevant views were broadcast.

63. The moderator of this program was of no significant assistance at the hearing. He was uncertain as to what matters were discussed and when they had been under discussion. There was no identification by any other party as to the content, time, or relevance of material broadcast on this program. July Decision, *supra*, at ¶ 13.

64. We also note that brief references to what someone had said (usually based upon a press report), used as the basis of an attack upon the statement (see, *e. g.*, Bureau Exh. 1–B, pp. 23–25), do not constitute a fair opportunity for the presentation of an opposing view.
*Id.* at ¶ 15 (footnote renumbered).

65. *Id.* at ¶ 16.

66. *Id.*

67. *Id.*

13 F.C.C. at 1251), and indeed it was hostile to such broadcasts."[68]

## 2. *Personal Attack Principle*

It was clear to the Commission, as it was to Examiner Irion, that WXUR "repeatedly violated the personal attack principle."[69] This was in spite of specific instructions from the Commission to Brandywine at the time that the initial transfer application was approved. This court need not recount these violations seriatim as the Commission has already done so for us.[70] The Commission continued by noting that the Examiner had found additional attacks, as to which no exceptions were taken by Brandywine; however, the Commission found it unnecessary to "adopt all of the Examiner's findings in this respect," because recitation of "indisputable examples is sufficient."[71]

Subsequent to the attacks in issue in the case at bar the personal attack principle was codified into a formal rule.[72] Under the terms of the rule the Commission exempted bona-fide newscasts, bona-fide interviews, and on-the-spot coverage of bona-fide news events from the earlier reply requirements of the principle. Examination discloses that none of these exemptions prove applicable to the attacks broadcast by Brandywine and hence, "Brandywine was . . . obligated to comply with the personal attack principle in regard to each one of the personal attacks."[73] In each case the Commission found that Brandywine failed to give notice to the party attacked as required; they failed to send the required copies of transcripts, tapes or summaries; and similarly, they failed to offer an opportunity to reply to the aggrieved party as required. More dispositive, however, was the fact that:

Brandywine had not established any procedures to insure compliance. (Tr. 1662–1670.) For example, Brandywine did not arrange to know either before or at the time of broadcast whether a given broadcast contained any personal attacks. (*Ibid.*) Brandywine was therefore incapable of sending transcripts, tapes or summaries of the broadcasts to those attacked either prior to or at the time of the broadcast.[74]

68. *Id.* at ¶ 17.

69. *Id.* at ¶ 18.

70. *See* Appendix B to the July Decision wherein the Commission enumerates the personal attacks made while discussing controversial public issues, *viz.*, the Vietnam War, issues relating to civil liberties, and issues relating to the loyalty of federal officials.

71. July Decision, *supra*, at ¶ 19.

72. Procedures in the Event of a Personal Attack, 12 F.C.C.2d 250 (1968).

73. July Decision, *supra*, at ¶ 20.

74. *Id.*
This leads to one of the fundamental difficulties with this case, *i. e.*, Brandywine's apparent refusal to undertake the necessary steps to insure compliance in the personal attack area. We reprint the following transcript excerpt to exemplify this point. Mr. Schattenfield is examining Mr. Norris, the station manager.
Q. Do you have someone listen to the tape prior to its being run?
A. I mentioned previously that we don't censor the broadcast.
Q. I didn't say censor. I said listen.
A. That would be censoring.
\* \* \* \* \*
Q. You don't listen to each tape before it is broadcast as a standard, do you?
A. No, that is impossible. I am only one individual.
Q. Do you have procedures at the station so that somebody listens to the tapes?
A. On Pastor Bob and some of the local ones. I believe Pastor Bob is on only one station, WXUR. There are other broadcasters that are on just this station.
Q. But he doesn't have a tape?
A. He doesn't have a tape. It is done live.
Q. On those programs you receive on tape, is it a standard operating procedure for you or someone under your direction to listen to them?
A. Not standard, we take it like we would on a network.

Again, the station's argument to the effect that its small staff excused it from performing in this area was unpersuasive. The Examiner was willing to excuse WXUR since those attacked often showed no concern; however, the principle was never geared at protecting persons from personal abuse, but rather "to enable the listening public to hear expositions of the various positions taken by responsible individuals and groups on important disputed issues."[75]

The Commission concluded that "Brandywine simply ignored its plain duty to the public" and that this conduct was "particularly reprehensible in light of the fact that the licensee had been cautioned at the outset concerning its duties in this area."[76]

3. *Representations as to Programming*

The Commission noted that an independent basis for denying the Brandywine renewal application was WXUR's utter failure to live up to its original representations concerning its program plans. The much-touted *Interfaith Forum*,[77] which was designed to promote open discussion concerning matters of modern-day religion, did not appear until November 28, 1965, ten days after the Media Borough Council's resolution, despite the fact that the program was promised specifically in Brandywine's January 25, 1965 transfer application amendment.[78] When *Interfaith Forum* did finally make its belated debut it did not fulfill its advertised purpose to " 'make every effort' to get a varied participation." The show never took the form of the promised round-table discussion but was an interview show on which students or faculty of the Faith Theological Seminary simply interviewed fellow seminarians. Brandywine sought to explain this away by claiming that the Greater Philadelphia Council of Churches had deliberately boycotted the program; yet, there is no support for this proposition in the record.[79]

Brandywine's actual programming practices were far more objectionable than the singular failure of *Interfaith Forum* to appear. From the very inception of Brandywine's control of WXUR there was a marked deviation from the original programming representations made to the Commission. Between April 29, 1965 and May 8, 1965 WXUR replaced a number of promised programs, mostly classified as "entertain-

---

Q. Is it standard procedure for you to have someone monitor it while they are on the air?

MR. COTTONE: That question has been asked and answered.

PRESIDING EXAMINER: I don't believe that precise question was asked. If it was I don't remember.

THE WITNESS: While it is on the air we didn't say to the announcers or the person on the air, "You must listen to that." I believe most of our help do listen to the programs.

\*　\*　\*　\*　\*

Q. Is it standard operating procedure for the station to assign someone to listen to each program as it is broadcast, each taped program as it is broadcast over WXUR, to determine whether positions are taken with respect to controversial issues and/or whether statements have been made which may be construed as attacks on individuals or groups?

A. Not in every case.

Tr. 1699–1701.

Thus the record is clear. Norris openly admitted that he either was physically incapable of personally dealing with personal attack problems or that the station was incapable of dealing with them. In addition, and of greater moment to this proceeding, was Norris' attitude that attempts at compliance would be tantamount to censorship. This obstinate and obdurate approach is indicative of a schematic design to frustrate compliance in this critical area.

75. July Decision, *supra*, at ¶ 21; 13 F.C.C. at 1249 and Red Lion Broadcasting Co., Inc. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

76. *Id.* at ¶ 22.

77. For a description of this program see p. 21, *supra*.

78. July Decision, *supra*, at ¶ 25.

79. *Id.* at ¶¶ 26–28.

**34**

ment," with seven new programs.[80] The Commission found, and logic dictates that this court agree, that the plans for each of these programs predated the actual transfer. These changes must be viewed as substantial inasmuch as they differed significantly from those programs which they were replacing and were a departure from the general format promised in the Brandywine transfer application: i. e., programming designed "for the purpose of broadcasting the Gospel of Our Lord and Savior Jesus Christ, for the defense of the Gospel and for the purposes set forth in the Seminary's Charter of Incorporation."[81]

The Commission refused to accept station manager Norris' representation that these new programs, for which sponsors allegedly purchased time from WXUR, were born of economic necessity in response to an alleged boycott on the part of commercial advertisers. Despite Brandywine's assertion that this action was in anticipation of the boycott, seven of the eight programs listed in footnote 80 were on the air between four and nine days after Brandywine's assumption of control.[82] Three of these programs were sponsored by an organization called the "American Patriotic News", which never paid any sponsorship fees to WXUR. As Norris was a trustee of the "American Patriotic News" and station manager of WXUR, it is safe to assume that he was aware that these three programs were generating no income. The Commission concluded that the Faith Theological Seminary

[failed to apprise us] fully concerning program plans, and also a significant

departure from an express representation concerning the fair treatment of all religious faiths [sic]. In view of the circumstances, these failures can not be laid to inadvertence. They must be considered a conscious course of conduct.[83]

The Commission closed its 23-page opinion by stating:

We conclude upon an evaluation of all the relevant and material evidence contained in the hearing record, that renewals of the WXUR and WXUR-FM licenses should not be granted. The record demonstrates that Brandywine failed to provide reasonable opportunities for the presentation of contrasting views on controversial issues of public importance, that it ignored the personal attack principle of the Fairness Doctrine, that the applicant's representations as to the manner in which the station would be operated were not adhered to, that no adequate efforts were made to keep the station attuned to the community's or area's needs and interests, and that no showing has been made that it was in fact, so attuned. *Any one of these violations would alone be sufficient to require denying the renewals here, and the violations are rendered even more serious by the fact that we carefully drew the Seminary's attention to a licensee's responsibilities before we approved transfer of the stations to its ownership and control.*[84]

On August 6, 1970 Brandywine filed a motion to reconsider with the Commission.

---

80. In order of appearance the new programs were entitled: *Lifeline; Manion Forum; Behind the Headlines; Howard Kershner's Commentary; Independent Americans; The Dan Smoot Report;* and *Church League of America.*

81. J.A. Vol. II, 99.

82. July Decision, *supra,* at ¶ 31.

83. *Id.* at ¶ 32. The Commission also considered the attention Brandywine had given to community needs and interests. However, since this ground for denial was deleted in the Commission's opinion on reconsideration, we do not discuss those findings here. Interested parties are directed to ¶¶ 33–38 of the July Decision, *supra.*

84. *Id.* at ¶ 39 (emphasis supplied).

### H. *Commission's Opinion on Reconsideration*

The Commission released its memorandum Opinion and Order [85] denying Brandywine's request for reconsideration on February 11, 1971. The central theme raised by Brandywine constituted an assertion that the Commission's July Decision extended the concept of the fairness doctrine to an unconstitutional brink in that the July Decision was predicated upon "a disapproval of the content of the programs on WXUR." The Commission commented:

> Our decision was based solely upon fairness concepts whose constitutional validity has been sustained by the Supreme Court in Red Lion Broadcasting Co., Inc. v. F. C. C., 395 U.S. 367 [89 S.Ct. 1794, 23 L.Ed.2d 371] (1969) and in no sense upon any Commission attitude toward the content of any view expressed over Brandywine's facilities.[86]

The Commission expressed the view that Brandywine's failure to meet the affirmative duty set forth in Red Lion Broadcasting Co., Inc. v. F. C. C.[87] to "offer to make available a reasonable amount of broadcast time to those who have a view different from that which has already been expressed on his station",[88] was not beyond the pale of constitutional reach by the Commission, merely by demonstrating the existence of offers of time during which the proponents of contrasting views were harassed. The Commission stressed that this was a matter of presentation and not one of content.

[W]e did not hold that . . . there was anything wrong *per se* in harassing conduct by a moderator, but only that Brandywine could not rely for its achievement of fairness upon a program where one side was singled out for harassment.[89]

The Commission proceeded to consider each of the issues which Brandywine raised and concluded by reaffirming the majority of its earlier views. Let us consider each issue separately as we did with regard to the *July Decision.*

#### 1. *The Fairness Issue*

In its petition for reconsideration Brandywine in no way challenged the Commission's earlier finding that despite Brandywine's initial representation and despite the Commission's strong warning in the transfer decision, "Brandywine had taken no steps to encourage the presentation of contrasting views on several issues of public importance where it had presented one side on each of these issues."[90] Brandywine contended that it had broadcast material on certain news, interview, and call-in shows which, although never considered by the Commission, did satisfy the fairness doctrine requirements as to these issues. The Commission began by reminding the licensee that its affirmative duties in the fairness arena would not be satisfied

> by leaving the expression of contrasting views to such happenstance as the remarks of an unknown person on a call-in program, or to the possibility that a pertinent question will be asked on a general interview program unan-

---

85. In Re Applications of Brandywine-Main Line Radio, Inc. For Renewal of Licenses of Stations WXUR and WXUR-FM, Media, Pa., 27 F.C.C.2d 565 (1971) (hereinafter the "February Decision").

86. *Id.* at ¶ 4.

87. 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed. 2d 371 (1969).

88. 395 U.S. at 391, 89 S.Ct. at 1807.

89. February Decision, *supra,* at ¶ 4, fn. 1. The Commission continued by stating: We do not agree with Brandywine that

our finding that fairness could not be achieved in a one-sidedly hostile setting was unfairly considered in the absence of a "warning" ruling. We have recently enunciated the same position in another case. Butte Broadcasting Co., 22 FCC2d 7 (1970), and we cannot accept the view that it is the sort of ruling which a licensee could not be expected to anticipate in the absence of a prior precedent. *Id.*

90. *Id.* at ¶ 5.

nounced as dealing with any particular issue and not presenting a guest selected as a responsible spokesman of a contrasting view.[91]

The Commission did not stop at this juncture but rather continued on to reexamine the material cited by petitioners and determined that this material was not "an expression of conflicting viewpoints in a reasonable ratio which might make a denial of renewal inappropriate."[92] The Commission commenced with an evidentiary point—the affirmative cases presented by the intervenors and the Broadcast Bureau, based on the two weeks of monitored programming, placed an evidentiary burden on Brandywine which could not be satisfied merely by demonstrating "some instances of the expression of opposing views in other time periods without also taking account of any further expression of the original views in such other time periods."[93] Brandywine failed to produce any evidence concerning what was broadcast during the periods they cited to the Commission except for those specific matters on which Brandywine relied. The Commission went on to say:

> In the face of the *prima facie* showing that its treatment of certain issues was unfair, Brandywine clearly was required to show how it encouraged the presentation of opposing views, or at least that the presentation of such views constituted a reasonable proportion to the time devoted to the issues, either throughout the license period or, at the minimum, during some other representative period of time. . . . Therefore, we adhere to our conclusion that Brandywine failed not only to seek some balance of opposing views but to carry opposing views in any fair ratio.[94]

Brandywine attempted to have the Commission exclude certain broadcast statements by Dr. McIntire since they were "religious."[95] The decision on which this attempt was founded was without relevance. The *Murray Letter*, on which Brandywine sought to rely, only held that devotional services were not a controversial issue within the scope and meaning of the fairness doctrine; but "[t]he fairness doctrine extends to all expressions of views on controversial issues of public importance, whether or not they may be deemed religious views by some persons."[96] This holding, the Commission stated, "is no more an abridgement of freedom of religion than of freedom of speech, an issue already decided by the Supreme Court in *Red Lion Broadcasting Co., supra.*"[97]

Brandywine charged that the Commission had neglected to consider various invitations to certain spokesmen. The Commission replied by commenting that "Brandywine mistakes our disagreement with its arguments for failure to consider them."[98] The Commission once again detailed its reasons for finding the Brandywine invitations inadequate. It also discounted McIntire's sundry invitations since they did not emanate from the licensee as the law requires. The Commission noted that its action was based primarily on the inadequacy of the various offers and once again spoke to Brandywine's practice of delegating its responsibilities under the fairness doctrine:

> Certainly if Dr. McIntire had made adequate invitations corresponding to the issues and had succeeded in getting spokesmen with opposing viewpoints to speak on his program, Brandywine would have been able to rely upon this success in complying with the fairness

91. *Id.* at ¶ 6.

92. *Id.*

93. *Id.* at ¶ 7.

94. *Id.*

95. Brandywine sought to base this argument, which the Commission rejected, on Madalyn Murray, 40 F.C.C. 647 (1965).

96. February Decision, *supra*, at ¶ 11.

97. *Id.*

98. *Id.* at ¶ 12.

doctrine. However, the converse does not obtain. Brandywine cannot absolve itself from failure to comply by merely pointing to Dr. McIntire's abortive efforts. Dr. McIntire's inadequate invitations and failure to get acceptances do not discharge Brandywine from its fairness duties. As we stated in the decision, "the ultimate responsibility of compliance with the fairness doctrine rests with the licensee." [99]

On the positive side of the scale, the Commission decided that based on materials broadcast outside of the monitored weeks that WXUR "should be given the benefit of the doubt" [100] with regard to its coverage of the Vietnam War issue. However, the Commission found that with reference to issues relating to federal administration policy and activities, civil rights and liberties, United States foreign relations, the proposed New Jersey group defamation law, major news media, and loyalty of federal officials, that the citations submitted by Brandywine were either inadequate, inaccurate, lacking or insufficient in light of the balance of one-sided broadcast presentation.[101]

### 2. *Personal Attack Principle*

Brandywine attempted to escape the evidentiary burden placed on it by the Commission by claiming that the standards imposed by the Commission were too vague. The Commission dealt with this allegation by stating:

Brandywine contends that our judgment that it carried personal attacks without notifying the persons attacked of their right to respond is without evidentiary support and that we have no clear definition of "honesty, character, integrity or like personal qualities" against which to measure Brandywine's actions. However, the Supreme Court has sustained the rules against the charge of vagueness in *Red Lion Broadcasting Co., supra,* and we think that the attacks made over WXUR (see Appendix B of our decision) were such that no reasonable doubt exists as to their proper characterization. Brandywine further charges that we have not explained why the attacks were not made during exempt news broadcasts. Putting aside the fact that Brandywine does not in fact assert that the attacks were made during bona fide news programs —something it should do if it believes we were in error—we think it plain that they were not. Brandywine did not introduce these programs when they were broadcast as newscasts and they consisted entirely of comments not commonly considered to be news reporting.[102]

In addition, the Commission rejected Brandywine's argument that an adverse finding with respect to the personal attack principle was inconsistent with other Commission rulings in this area.[103]

99. *Id.* at ¶ 13. The Commission, in response to an allegation that the same reasoning applies to networks, stated:
> [I]f the network presents both sides of a controversial issue, the affiliates which carry these broadcasts are not obligated to do more; but if the network fails to present opposing views, the affiliate is not thereby excused from its obligation to do so.

*Id.*

100. *Id.* at ¶ 7, fn. 6.

101. *Id.*

102. *Id.* at ¶ 14.

103. Brandywine sought to draw an analogy to the case of In re Complaint by Mrs. Dorothy Healey, 24 F.C.C.2d 487 (1970) which involved an exemption for a bona fide newscast or to the case of Station WAVA, 14 P & F Radio Reg.2d 180 (1968) wherein the Commission held there was no attack upon
> "honesty, integrity, character, or like personal qualities" to say: "as the field is now drawn, only Hubert Humphrey, a product of New Deal thinking, and Richard Nixon, a product of the Eisenhower years, probably are incapable of establishing any meaningful liaison with this generation."

February Decision, *supra,* at ¶ 15.

The Commission also ruled that a 1969 finding by its Broadcast Bureau was not inconsistent with its ruling concerning certain remarks, not at issue in the case, broadcast by Brandywine. The Commission held the 1969 staff decision to be correct.

> In any event, what is important here is *not* whether there may be a reasonable doubt as to the correctness of the staff ruling in another situation, but rather whether there was such a doubt about the comments . . . in this case. We do not believe that Brandywine could have had such a doubt; nevertheless, it failed to follow the requirements of the rules.[104]

The final contention in this area, which the Commission also rejected, was that the Commission's decision constituted an unconstitutional *ex post facto* approach to the July, 1967 personal attack rules. The reason that the Commission rejected this contention was that the rules codified precepts which were already in effect and which Brandywine had specifically been made aware of by the Commission's transfer order.[105]

3. *Representations Concerning Program Plans*

Once again, the Commission stressed that its concern was not with title changes being made to the program schedule but to Brandywine's "willingness to withhold [its] intentions with respect to a substantial amount of programming." [106] The action taken against Brandywine had nothing to do with program content; it was aimed against WXUR solely because of its failure to "candidly advise us and the public of its intentions." [107] The Commission determined that its concern was not based on WXUR's motive but rather its conduct.

> "The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones." F. C. C. v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946).[108]

The Commission concluded the *February Decision* by deleting its adverse findings in the *July Decision* as to the issue of ascertainment of community needs [109] and found, still again, "that Brandywine is not entitled to renewal of licenses of WXUR and WXUR–FM." [110]

Brandywine has taken the instant appeal from these findings.

## II. THE FAIRNESS DOCTRINE

■■ The requirements of the fairness doctrine are by no means regulations of recent advent. Not only is the concept of the doctrine an established historical fact in the broadcast industry but the doctrine itself has been little changed over the years. The purpose of the doctrine is to assure that when controversial issues of public importance are aired on radio and television frequencies that fair coverage be given to both sides of issues presented. The doctrine is a "common law development" which has evolved from a long line of rulings by the Commission on a case by

---

104. *Id.* at ¶ 16.

105. *Id.* at ¶ 17.

106. *Id.* at ¶ 18.

107. *Id.* at ¶¶ 18–19.

108. *Id.* at ¶ 18.

109. *Id.* at ¶¶ 20–27. In his statement concurring in part and dissenting in part, Commissioner Nicholas Johnson dissented from this finding. He stated:

> There is little question in my mind that Brandywine has failed, and failed dismally, in its duty under the standards set out above to ascertain *its* community's needs for broadcast service.

He continued:

> In sum, I see no good reason in this case to suddenly retreat from our earlier more sensible analysis of the Fairness and Ascertainment issues—even given the fact that we could still revoke the WXUR licenses on other well-founded grounds.

February Decision, *supra*, 27 F.C.C.2d at 579 (Johnson, concurring in part, dissenting in part).

110. *Id.* at ¶ 27.

case basis. As Justice White pointed out in *Red Lion*, the doctrine "is distinct from the statutory requirement of § 315 of the Communications Act [111] that equal time be allotted all qualified candidates for public office." [112] In 1967 the Commission codified two corollaries of the doctrine—the personal attack doctrine and the rules relating to political editorializing.[113]

---

[111]. Communications Act of 1934, Tit. III, 48 Stat. 1081, as amended, 47 U.S.C. § 301 et seq. Section 315 now reads:

315. Candidate for public office; facilities; rules

(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide newscast,

(2) bona fide news interview,

(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto), shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

(b) The charges made for the use of any broadcasting station for any of the purposes set forth in this section shall not exceed the charges made for comparable use of such station for other purposes.

(c) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

Red Lion Broadcasting Co., Inc. v. F.C.C., *supra*, 395 U.S. at 370, 89 S.Ct. 1794, 23 L.Ed.2d 371 (footnote renumbered).

[112]. *Id.*, 395 U.S. at 369–370, 89 S.Ct. at 1796.

[113]. Shortly after the original *Red Lion* litigation commenced the Commission published its Notice of Proposed Rule Making, 31 Fed.Reg. 5710, in which it sought to make its personal attack doctrine more precise and more readily enforceable. In addition, the Commission sought to clarify the rules relating to political editorializing by licensees. These rules were adopted, 32 Fed.Reg. 10303, and have been amended several times. They currently read as follows:

¶ 73.123 Personal attacks; political editorials.

(a) When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than 1 week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities.

(b) The provisions of paragraph (a) of this section shall not be applicable (1) to attacks on foreign groups or foreign public figures; (2) to personal attacks which are made by legally qualified candidates, their authorized spokesmen, or those associated with them in the campaign, on other such candidates, their authorized spokesmen, or persons associated with the candidates in the campaign; and (3) to bona fide newscasts, bona fide news interviews, and on-the-spot coverage of a bona fide news event (including commentary or analysis contained in the foregoing programs, but the provisions of paragraph (a) of this section shall be applicable to editorials of the licensee).

Note: The fairness doctrine is applicable to situations coming within (b) (3), above, and, in a specific factual situation, may be applicable in the general area of political broadcasts (b) (2), above. See, section 315 (a) of the Act,

The Supreme Court's opinion in *Red Lion* went to great lengths at setting out the history of the birth of the fairness doctrine and its related regulations. We shall review that material here because of its critical importance to the case at bar.·

The government was not always engaged in the regulation of broadcast frequencies. In fact, it was only out of dire necessity and sheer confusion, accompanied by utter chaos, that the government entered into a role of broadcast regulation.[114] Indeed, it was not until 1927 that responsibility for the assignment and allocation of radio frequencies was assumed by the government.

It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard.[115] Con-

47 U.S.C. § 315(a); Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance. 29 F.R. 10415. The categories listed in (b)(3) are the same as those specified in section 315 (a) of the Act.

(c) Where a licensee, in an editorial, (i) endorses or (ii) opposes a legally qualified candidate or candidates, the licensee shall, within 24 hours after the editorial, transmit to respectively (i) the other qualified candidate or candidates for the same office or (ii) the candidate opposed in the editorial (1) notification of the date and the time of the editorial; (2) a script or tape of the editorial; and (3) an offer of a reasonable opportunity for a candidate or a spokesman of the candidate to respond over the licensee's facilities: *Provided, however*, That where such editorials are broadcast within 72 hours prior to the day of the election, the licensee shall comply with the provisions of this paragraph sufficiently far in advance of the broadcast to enable the candidate or candidates to have a reasonable opportunity to prepare a response and to present it in a timely fashion.

[32 F.R. 10305, July 13, 1967, as amended at 33 F.R. 5364, Apr. 4, 1968] 47 C.F.R. §§ 73.123, 73.300, 73.598, 73.679 (1972).

114. Because of this chaos, a series of National Radio Conferences was held between 1922 and 1925, at which it was resolved that .regulation of the radio spectrum by the Federal Government was essential and that regulatory power should be utilized to ensure that allocation of this limited resource would be made only to those who would serve the public interest. The 1923 Conference expressed the opinion that the Radio Communications Act of 1912, 37 Stat. 302, conferred upon the Secretary of Commerce the power to regulate frequencies and hours of operation, but when Secretary Hoover sought to implement this claimed power by penalizing the Zenith Radio Corporation for operating on an unauthorized frequency, the 1912 Act was held not to permit enforcement. United States v. Zenith Radio Corporation, 12 F.2d 614 (D.C. N.D.Ill.1926). Cf. Hoover v. Intercity Radio Co., 52 App.D.C. 339, 286 F. 1003 (1923) (Secretary had no power to deny licenses, but was empowered to assign frequencies). An opinion issued by the Attorney General at Hoover's request confirmed the impotence of the Secretary under the 1912 Act. 35 Op. Atty.Gen. 126 (1926). Hoover thereafter appealed to the radio industry to regulate itself, but his appeal went largely unheeded. See generally L. Schmeckebier, The Federal Radio Commission 1–14 (1932).

Red Lion Broadcasting Co. v. F.C.C., *supra*, 395 U.S. at 375–376, fn. 4, 89 S. Ct. at 1799.

115. Congressman White, a sponsor of the bill enacted as the Radio Act of 1927, commented upon the need for new legislation:

"We have reached the definite conclusion that the right of all our people to enjoy this means of communication can be preserved only by the repudiation of the idea underlying the 1912 law that anyone who will may transmit and by the assertion in its stead of the doctrine that the right of the public to service is superior to the right of any individual. . . . The recent radio conference met this issue squarely. It recognized that in the present state of scientific development there must be a limitation upon the number of broadcasting stations and it recommended that licenses should be issued only to

sequently, the Federal Radio Commission was established to allocate frequencies among competing applicants in a manner responsive to the public "convenience, interest, or necessity." [116] The Court continued:

Very shortly thereafter the Commission expressed its view that the "public interest requires ample play for the free and fair competition of opposing views, and the commission believes that the principle applies . . . to all discussions of issues of importance to the public." Great Lakes Broadcasting Co., 3 F.R.C.Ann. Rep. 32, 33 (1929), rev'd on other grounds, 59 App.D.C. 197, 37 F.2d 993, cert. dismissed, 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1930). This doctrine was applied through denial of license renewals or construction permits, both by the FRC, Trinity Methodist Church, South v. FRC, 61 App. D.C. 311, 62 F.2d 850 (1932), cert. denied, 288 U.S. 599, 53 S.Ct. 317, 77 L. Ed. 975 (1933), and its successor FCC, Young People's Association for the Propagation of the Gospel, 6 F.C. C. 178 (1938). After an extended period during which the licensee was obliged not only to cover and to cover fairly the views of others, but also to refrain from expressing his own personal views, Mayflower Broadcasting Corp., 8 F.C.C. 333 (1940), the latter limitation on the licensee was abandoned and the doctrine developed into its present form.

There is a two fold duty laid down by the FCC's decisions and described by the 1949 Report on Editorializing by Broadcast Licensees, 13 F.C.C.

1246 (1949). The broadcaster must give adequate coverage to public issues, United Broadcasting Co., 10 F. C.C. 515 (1945), and coverage must be fair in that it accurately reflects the opposing views. New Broadcasting Co., 6 P & F Radio Reg. 258 (1950). This must be done at the broadcaster's own expense if sponsorship is unavailable. Cullman Broadcasting Co., 25 P & F Radio Reg. 895 (1963). Moreover, the duty must be met by programming obtained at the licensee's own initiative if available from no other source. John J. Dempsey, 6 P & F Radio Reg. 615 (1950); see Metropolitan Broadcasting Corp., 19 P & F Radio Reg. 602 (1960); The Evening News Assn., 6 P & F Radio Reg. 283 (1950). The Federal Radio Commission had imposed these two basic duties on broadcasters since the outset, Great Lakes Broadcasting Co., 3 F.R. C.Ann.Rep. 32 (1929), rev'd on other grounds, 59 App.D.C. 197, 37 F.2d 993, cert. dismissed, 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1930); Chicago Federation of Labor v. FRC, 3 F.R.C.Ann.Rep. 36 (1929), aff'd, 59 App.D.C. 333, 41 F.2d 422 (1930); KFKB Broadcasting Assn. v. FRC, 60 App.D.C. 79, 47 F.2d 670 (1931), and in particular respects the personal attack rules and regulations at issue here have spelled them out in greater detail.[117]

Having laid the necessary historical predicate we can turn our attention to the law of the fairness doctrine.

The need for radio regulation has not seriously been questioned in over fifty years. As much as our historical study

---

those stations whose operation would render a benefit to the public, are necessary in the public interest, or would contribute to the development of the art. This principle was approved by every witness before your committee. We have written it into the bill. If enacted into law, the broadcasting privilege will not be a right of selfishness. It will rest upon an assurance of public interest to be served." 67 Cong.Rec. 5479.

395 U.S. at 376, fn. 5, 89 S.Ct. at 1799 (footnote renumbered).

116. Radio Act of 1927, § 4, 44 Stat. 1163. See generally Davis, The Radio Act of 1927, 13 Va.L.Rev. 611 (1927).
395 U.S. at 377, fn. 6, 89 S.Ct. 1794 (footnote renumbered).

117. 395 U.S. at 377–378, 89 S.Ct. at 1799, 23 L.Ed.2d 371.

shows a need for this regulation, there has been a concomitant need for a fairness doctrine. America has turned away from its town meeting and processes of rural decision making. This is the electronic age—an age in which communications systems relay information to an eager public in fractions of milliseconds. Information has become the stock and trade of our informed public. So too has our method of getting information changed in the last half century. We are shifting our emphasis from the printed media to the electronic media. Radio and television consume massive portions of America's time. Because of this we must assume that the public be given access to varied information so that they may remain an intelligent and viable group—free to choose from the options available to them—free to make a choice. In a recent appearance before the Senate Subcommittee on Communications, Nicholas Johnson, a Commissioner of the F.C.C., expressed the need of the American people for which the Commission has undertaken to provide. This parable states the problems involved so succinctly that we reprint it in full:

> Once upon a time there was a nation great in ideals and industrialization. It had businesses everywhere—and unsurpassed military might. Yet its greatest strength lay in its ideological foundation. This nation professed to be governed by the consent of its citizens. To ensure the successful functioning of this unique experiment in government, free education, libraries and full information were provided to all, so that this nation's two-hundred million governors, through wide-open debate, might govern themselves wisely. But as the years slipped by, the people spent more and more of their time in their air conditioned homes watching television, and less and less time listening to speakers in the public parks, attending town meetings,

and reading handbills on the streets. Meanwhile, the number and importance of crucial issues were growing, and the need for well informed governors became paramount. Thus it was the great debate about the great debate began.

> Everyone had his own theory of how to reverse this trend and return the democratic dialogue to the people, who were all at home watching their television sets. Some advocated letters, petitions, press conferences and picketing, but they had little success. Attention shifted to those who advocated bombing, burning, shooting and looting, because before and after the televising of such activities it was usually possible to present a short message, however distorted, concerning the merits of the controversy that generated such outrageous conduct. Then a third group came along. It said, "Let us simply go to the broadcasters peacefully, ask them for the time to present our concerns—we will even pay them." But the broadcasters politely explained that there was no time available for the discussion of public issues—such as war, life and politics—because the time all had to be used for programs and announcements necessary to the very difficult but essential task of inducing consumers to buy useless, joyless, and sometimes harmful products. Yet these patient and patriotic students, businessmen, and Senators were not deterred. They continued to preach the doctrine of "working within the system." "The Government," they said, "will treat us fairly. There is reason and justice in our land. Surely a democratic people need not be violent to be heard." And so it was that they came to the Federal Communications Commission . . . . [118]

In the past months this court, and several other circuit courts, have examined the fairness doctrine on several oc-

118. Hearings on S.J.Res. 209 before the Subcom. on Communications of the Senate Committee on Commerce, 91st Cong., 2d Sess. 155 (1970) (Statement of Commissioner Nicholas Johnson).

casions, sometimes at great lengths.[119] It is clear to this court, therefore, that what we are about to state, with reference to the law in this area, is merely repetitive of our prior efforts. Nothing which we state here is new; however, it is our hope that through our efforts we will be able to instruct appellants as to the proper standard of the law and that we will allay any lingering doubts that appellants may have as to our consideration of the pertinent authorities.

The Commission's most recent elaboration on the fairness doctrine came following the *Red Lion* decision. In In the Matter of Obligations of Broadcast Licensees Under the Fairness Doctrine [120] the Commission posited:

The fairness doctrine was evolved as a policy under the public interest standard in a series of cases, given its definitive policy statement in the Commission's 1949 Editorializing Report (13 F.C.C. 1246), and codified into the Communications Act of 1959. See section 315(a), 47 U.S.C. 315(a); Red Lion Broadcasting Company, Inc. v. Federal Communications Commission, *supra*. It requires the broadcast licensee to afford reasonable opportunity for the discussion of conflicting viewpoints on controversial issues of public importance. The Commission early determined that if the fairness doctrine were to achieve its most salutary purpose, an affirmative obligation in this respect must be imposed upon the licensee . . . .

\* \* \* \* \* \*

The Commission's general approach to this facet of the fairness doctrine

is set forth in a 1964 ruling, Letter to Mid-Florida Television Corporation, 40 F.C.C. 620, 621 (1964):

. . . The Commission does not seek to establish a rigid formula for compliance with the fairness doctrine. The mechanics of achieving fairness will necessarily vary with the circumstances, and it is within the discretion of each licensee, acting in good faith, to choose an appropriate method of implementing the policy to aid and encourage expression of contrasting viewpoints. Our experience indicates that licensees have chosen a variety of methods, and often combinations of various methods . . . .[121]

This court made it clear in Democratic National Committee v. F. C. C. that "[t]he importance of the fairness doctrine is neither academic nor is it an administrative nicety. As the Commission stated: 'The keystone of the fairness doctrine and of the public interest is the right of the public to be informed—to have presented to it the "conflicting views of issues of public importance".' "[122] The proposition of the fairness doctrine is easy to understand, and to accept, when one considers that because of the finite number of broadcast frequencies available "they have been necessarily considered a public trust. Every licensee who is fortunate in obtaining a license in mandated to operate in the public interest and has assumed the obligation of presenting important public questions fairly and without bias."[123] Because of the evident importance of the

119. *See, e. g.,* M. Goldseker Real Estate Co. v. F.C.C., 456 F.2d 919 (4th Cir. 1972); Healey v. F.C.C., 148 U.S.App. D.C. 409, 460 F.2d 917 (1972); Democratic National Committee v. F.C.C., 148 U.S.App.D.C. 383, 460 F.2d 891 (1972); Columbia Broadcasting System, Inc. v. F.C.C., 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971); Larus & Brother Company v. F.C.C., 447 F.2d 876 (4th Cir. 1971); Green v. F.C.C., 144 U.S.App. D.C. 353, 447 F.2d 323 (1971); Neckritz v. F.C.C., 446 F.2d 501 (9th Cir. 1971).

120. 23 F.C.C.2d 27 (1970).

121. *Id.,* 23 F.C.C.2d at 28.

122. *Supra,* 148 U.S.App.D.C. at 392, 460 F.2d at 900, *citing* Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed.Reg. 10416, 10418, 40 F.C. C. 598, 604 (1964). *See also* Letter to Cullman Broadcasting Co., 40 F.C.C. 576 (1963).

123. S.Rep.No.562, 86th Cong. 1st Sess. 9 (1959), U.S.Code Cong. & Admin.News 1959, p. 2571.

**44**

doctrine "it is the manifest intention of the Commission to maintain it as a viable instrument in protecting the right of the public to be fully informed on controversial issues." [124]

 The fairness doctrine is not subject to a formulistic application. Meeting the obligations can only be achieved by seeking out balance in broadcast coverage. Precise mathematic equality is neither required nor desirable. The cornerstone of the doctrine is good faith and licensee discretion.

[T]he licensee, in applying the fairness doctrine, is called upon to make reasonable judgments in good faith on the facts of each situation—as to whether a controversial issue of public importance is involved, as to what viewpoints have been or should be presented, as to the format and spokesmen to present the viewpoints, and all the other facets of such programming. [125]

This is an area in which the Commission has exercised a substantial degree of restraint.

In passing on any complaint in this area, the Commission's role is not to substitute its judgment for that of the licensee as to any of the above programming decisions, but rather to determine whether the licensee can be said to have acted reasonably and in good faith. There is thus room for considerably more discretion on the part of the licensee under the fairness doctrine than under the "equal opportunities" requirement. [126]

Licensees seeking to meet the requirements imposed by the doctrine must be mindful of Congressional intent. It was never intended by either Congress, or the Commission, that the doctrine work toward suppression of the discussion of controversial issues. To the contrary the intent of the drafters was to "[require] the discussion of conflicting views on issues of public importance." [127]

124. On June 9, 1971 the Commission adopted a Notice of Inquiry In the Matter of The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 30 F.C.C.2d 26 (1971). In the words of the Commission:

The purpose of this Notice is to institute a broad-ranging inquiry into the efficacy of the fairness doctrine and other Commission public interest policies, in light of current demands for access to the broadcast media to consider issues of public concern. It is important to stress that we are not hereby disparaging any of the ad hoc rulings that we have made in these areas. Rather, we feel the time has come for an overview to determine whether the policies derived largely from these rulings should be retained intact or, in lesser or greater degree, modified. . . Interested parties may address [any aspect of the problem.]

Thus, it is clear that the Commission is seeking to maintain the efficacy of the doctrine while guaranteeing adequate access to the public on controversial issues. It is encouraging to note that the Commission has sought widespread in-put in formulating its thinking in this crucially important area.

Democratic National Committee v. F.C.C., *supra* at 392, 460 F.2d at 900 (footnote renumbered).

125. Applicability of the Fairness Doctrine, *supra*, 29 Fed.Reg. at 10416, 40 F.C.C. at 599.

126. *Id.* This same general theme was espoused by the Commission much earlier in Editorializing by Broadcast Licensee, 13 F.C.C. 1246 (1949):

It should be recognized that there can be no one all embracing formula which licensees can hope to apply to insure the fair and balanced representation of all public issues. Different issues will inevitably require different techniques of presentation and production. The licensee will in each instance be called upon to exercise his best judgment and good sense in determining what subjects should be considered, the particular format of the programs to be devoted to each subject, the different shades of opinion to be presented, and the spokesman for each point of view. *Id.* at 1251.

127. Loevinger, Free Speech, Fairness and Fiduciary Duty in Broadcasting, 34 Law and Contemp.Prob. 278, 285 (1969).

The Supreme Court spelled out the duties of the licensee in the clearest possible terms in *Red Lion*.

The broadcaster must give adequate coverage to public issues, . . . and coverage must be fair in that it accurately reflects the opposing views. . . . This must be done at the broadcaster's own expense if sponsorship is unavailable. . . . Moreover, the duty must be met by programming obtained at the licensee's own initiative if available from no other source.[128]

Let us pause for a moment to reflect on the *Red Lion* litigation. The case arose out of an alleged breach of the personal attack doctrine. The attack came in the form of an opinionated broadcast by Rev. Billy Hargis, who also frequently broadcast on WXUR. Red Lion, which was managed by John H. Norris, the station manager of WXUR, failed to meet the requirements of the Commission which a licensee must follow in the event of a personal attack. These requirements, which are set out in *Times-Mirror Broadcasting Co.*,[129] call upon the licensee to send a tape, transcript or summary of the broadcast containing the attack to the wronged party. The licensee is required to offer the aggrieved party an opportunity to respond and must see that this opportunity be made without regard as to whether the response time will be paid for. In the opinion of this court in *Red Lion*[130] we went to great lengths to set out all of the correspondence between the Commission and Norris. Our account runs on for pages. Yet despite all of the instruction received by Norris he remained incapable of, or unwilling to, comply with the requirements in either *Red Lion* or the case currently under consideration.

The recent cases in our jurisdiction are more than adequate in setting out the current state of the law. In Green v. F. C. C.,[131] a case involving requests for time to oppose military enlistment on the air waves,

Judge Wilkey wrote that the doctrine did not require identical treatment for differing viewpoints of controversial issues, "as this would place an onerous and impractical burden on the licensees." Green v. F. C. C., *supra,* 144 U.S.App.D.C. at 358, 447 F.2d at 328. In addition we made it clear that unlike those corollaries to the doctrine that create equal-opportunities situations the doctrine itself does not create a right for any person or group to be granted time. "[T]he licensees may exercise their judgment as to what material is presented and by whom . . . . The fairness doctrine is issue-oriented, and it would be sufficient if each licensee could show that the point of view advocated by petitioner . . . had been or was being presented on its station by others." *Id.* In our opinion in Business Executives' Move for Vietnam Peace v. F. C. C., *supra* [146 U.S.App.D.C. 181, 450 F.2d 642], we held that "[u]nder the permissive 'reasonableness' standard of the fairness doctrine, acceptance of [a] particular format is by no means compulsory." *Id.,* at 187 of 146 U.S.App.D.C., at 648 of 450 F.2d. Thus, in opinion after opinion the Commission and the courts have stressed the wide degree of discretion available under the fairness doctrine and we have clearly stated time after time, *ad infinitum ad nauseam,* that the key to the doctrine is no mystical formula but rather the exercise of reasonable standards by the licensee. *See also* Neckritz v. F. C. C., 446 F.2d 501, 502 (9th Cir. 1971).[132]

▆▆▆▆ We reiterate—all that is required is balance; equal opportunities,

---

128. Red Lion, *supra,* 395 U.S. at 377–378, 89 S.Ct. at 1800, 23 L.Ed.2d 371.

129. 24 P & F Radio Reg. 404 (1962).

130. 127 U.S.App.D.C. 129, 381 F.2d 908 (1967).

131. *Supra,* note 119.

132. Democratic National Committee, *supra,* 395, 460 F.2d at 903.

except as specifically provided in § 315, are not required. We believe that imposing an absolute equal time standard for controversial issues would work to the detriment of the established intent of Congress and the Commission. As the Commission has previously noted:

> We have long stressed the different manner in which the "equal opportunities" and fairness requirements of Section 315 operate. The former is applicable only to uses of station facilities by candidates for public office and calls for *equal* treatment—as to the amount of time to be afforded, the nature of the time slot, etc. It thus works with virtually mathematical precision.[133] The Commission continued:

> In 1959 Congress codified the fairness doctrine, by inserting the provision in Section 315(a) that broadcast licensees "must operate in the public interest and . . . afford reasonable opportunity for the discussion of conflicting views on controversial issues of public importance." The conference report makes clear that this was a Congressional "restatement of the basic policy of the 'standard of fairness' which is imposed on broadcasters under the Communications Act of 1934" (H.Rep.No.1069, 86th Cong., 1st Sess., p. 5 (1959)) . . . . And, finally, the Supreme Court's opinion in *Red Lion* significantly recognizes the *Editorializing Report* as the statement of the basic principles embodied in the fairness doctrine. *See Red Lion supra* [395 U.S.] at pp. 384–386 [89 S. Ct. 1794].[134]

The ultimate test in this area is reasonableness. "The critical issue is whether the sum total of the licensee's efforts, taking into account his plans when the issue is a continuing one can be said to constitute a reasonable opportunity to inform the public on the contrasting viewpoint—one that is fair in the circumstances." [135]

 As the Fourth Circuit pointed out recently, the first line for deciding fairness cases is the good faith of the licensee.[136] It is, therefore, here that we must begin our analysis.

 The record of Brandywine-Main Line Radio is bleak in the area of good faith. At best, Brandywine's record is indicative of a lack of regard

---

133. Committee for the Fair Broadcasting of Controversial Issues, 25 F.C.C.2d 283, 291 (1970) (emphasis in the original). In Committee for Fair Broadcasting, *supra*, 25 F.C.C.2d at 292, the Commission explained its reasons for supporting the doctrine:

> We do not believe that any extended discussion is needed as to why the licensee is afforded so much discretion under the fairness doctrine. In our judgment, based on decades of experience in this field, this is the only sound way to proceed as a general policy. A contrary approach of equal opportunities, applying to controversial issues generally the specific equal opportunities requirements for political candidates would in practice not be workable. It would *inhibit, rather than promote,* the discussion and presentation of controversial issues in the various broadcast program formats (e. g., newscasts; interviews, documentaries). For it is just not practicable to require equality with respect to the large number of issues dealt with in a great variety of programs on a daily and continuing basis. Further, it would involve this Commission much too deeply in broadcast journalism; we would indeed become virtually a part of the broadcasting "fourth estate," overseeing thousands of complaints that some issue had not been given "equal treatment." We do not believe that the profound national commitment to the principle that debate on public issues should be "uninhibited, robust, wide-open" (New York Times Co. v. Sullivan, 376 U.S. 254, 270 [84 S.Ct. 710, 11 L.Ed.2d 686]) would be promoted by a general policy of requiring equal treatment on all such issues, with governmental intervention to insure such mathematical equality.

(Footnote omitted.)

134. *Id.* at 293 (emphasis in original). *See generally* 67 Cong.Rec. 12502–04.

135. *Id.* at 295.

136. Larus & Brother Company v. F.C.C., *supra*, 447 F.2d at 879.

for fairness principles; at worst, it shows an utter disdain for Commission rulings and ignores its own responsibilities as a broadcaster and its representations to the Commission. At the very outset Brandywine was informed by the Commission, in the *Borst Decision,* of the obligations of the licensee under both the fairness doctrine and the personal attack principle. This action was made necessary in the first instance because of the fear of so many in the community. It is apparent now that this fear was warranted and well founded. During the entire license period Brandywine willfully chose to disregard Commission mandate. With more brazen bravado than brains, Brandywine went on an independent frolic broadcasting what it chose, in any terms it chose, abusing those who dared differ with its viewpoints. This record is replete with example after example of one sided presentation on issues of controversial importance to the public. It is not necessary for this court to recount these matters again here. The Commission has amply done so and the record supports their contentions to the penultimate degree.

Rev. McIntire's attitude toward the fairness doctrine and the rights of the public in general is made clear by considering the following excerpts from an exchange of correspondence between McIntire and Albert J. Zack, Director of Public Relations for the AFL–CIO. Let us first consider this excerpt in a letter from Zack to McIntire, sent on November 5, 1965, in response to McIntire's invitation for Zack to appear on *20th Century Reformation Hour:*

> Day after day, program after program, you expound a point of view which is not only contrary to mine, and that of most Americans, but which grossly offends the concepts of Christian ethics. You now propose to set everything right by asking me to come to Collingswood and speak in reply to anything you may say concerning me.

It simply will not do, Dr. McIntire. This not only does not meet the legal definition of "fairness"; but it does not meet the far more significant standards set by the conscience of men.

No, I will not come to Collingswood, though it is otherwise a pleasant town. I will not give credence to your argument that one appearance by an opponent answering anything you may say is adequate to balance your incessant drumfire of disunion and hate.

If you wish, we will supply you with a tape or tapes of full program length telling the truth about the trade union movement and its policies, which you can alternate with your own daily commentaries, on your time —which, let us remember, is my time, too, since [the] air belongs to us all.[137]

Dr. McIntire replied on November 13, 1965 in these terms:

> You have completely misrepresented and misunderstood my invitation, as I did not imply even that your appearance in response to your attack upon me would "set everything right." As to the FCC's "fairness doctrine" and its legal definition, *the FCC has made it plain that this so-called fairness doctrine comes into play on a specific broadcast only when an individual's character and integrity are attacked, but a discussion of one's views and the position which he holds in our national life is a proper and legitimate subject for debate* under the protections of the guarantees of freedom of speech and the free exercise of religion in the First Amendment. My offer to you actually went beyond any "legal" definition of fairness. . . .
>
> . . . . . .
>
> . . . Radio stations are privately owned and it is possible in the dissemination of radio for private interests to contract for the time—which the 20th Century Reformation Hour has done. This time, for which we

---

137. J.A. Vol. IV, 812.

pay, is ours and not yours; nor does it belong to both of use with an obligation upon me to share it equally with you. It would appear to me that you have what I would call a rather socialistic view in this regard.[138]

We could give many more examples from the weighty record in this case, however, we fail to see what purpose that would serve. The exchange cited above makes it clear that McIntire either did not understand the fairness doctrine or chose to merely ignore it by twisting the law to meet his own requirements. McIntire attributes the requirements of the doctrine to the personal attack rules. Certainly, the doctrine is not so limited as this would imply. The doctrine requires balance when dealing with controversial issues of public importance. This is the extent of fairness.

Throughout the pendency of these proceedings appellants have attempted to obfuscate the actual issues in this case by injecting a smoke-screen issue relating to McIntire and his *20th Century Reformation Hour*. Throughout the record we find references to stations cancelling the McIntire program because of the requirements of the fairness doctrine and, indeed, the suggestion is infused more than once that the Commission was "out to get" the Reverend. Certainly, none of this is central to the case at bar and little of it is relevant. These incantations amount to childish prattle. By cloaking these charges in the clothing of the first amendment [139] McIntire attempts to conjure right which the Constitution simply does not provide. As Alexander Hamilton said in another setting:

> To judge from the conduct of the opposite parties, we shall be led to conclude that they will mutually hope to evince the justness of their opinions,

and to increase the number of their converts by the loudness of their declarations and the bitterness of their invectives.[140]

This is what we have here. At the risk of assisting Rev. McIntire in his bid for self-martyrdom, we note that his behavior is reminiscent of that of a not so legendary knight-errant named Quixote —who engaged himself by riding against otherwise harmless wind-mills. The actions taken by the Commission with reference to both Rev. McIntire and WXUR are more than supported by the record. Attempting to place the blame on the Commission for the shortcomings of the broadcaster and/or the licensee will not do. It would do the parties well to remember that:

> The fault, dear Brutus, is not in our stars,
>
> But in ourselves, that we are underlings.[141]

Left to their own wiles, Brandywine and Dr. McIntire would set the fairness doctrine to rest in a not so solemn sepulchre without regard for the right of the community to be fully informed. This record could not support the Commission's findings in this area more strongly.

## III. PERSONAL ATTACK DOCTRINE

The law in this area is well settled. Whenever there is an attack made on a person or group in the context of a controversial issue of public importance the individual attacked has a right to respond. The right is extended on the basis of two separate lines of authority— the holdings in *Red Lion* and *Times-Mirror Broadcasting Co.*, and on the basis of the Commission's regulations.[142]

These obligations differ from the general fairness requirement that issues

---

138. J.A. Vol. IV, 813–14 (emphasis supplied).

139. We consider appellant's first amendment contentions in Section V, *infra.*

140. A. Hamilton, The Federalist Papers, No. 1.

141. W. Shakespeare, Julius Caesar, Act 1, Sc. 2, line 134.

142. 47 C.F.R. § 73.123 (1972).

be presented, and presented with coverage of competing views, in that the broadcaster does not have the option of presenting the attacked party's side himself or choosing a third party to represent that side. But insofar as there is an obligation of the broadcaster to see that both sides are presented, and insofar as that is an affirmative obligation, the personal attack doctrine and regulations do not differ from the preceding fairness doctrine. The simple fact that the attacked men or unendorsed candidates may respond themselves or through agents is not a critical distinction, and indeed, it is not unreasonable for the FCC to conclude that the objective of adequate presentation of all sides may best be served by allowing those most closely affected to make the response, rather than leaving the response in the hands of the station which has attacked their candidacies, endorsed their opponents, or carried a personal attack upon them.[143]

The Supreme Court laid to rest any existing challenges as to the Commission's authority in enacting regulations under the personal attack doctrine in *Red Lion*.[144] Congress has given a mandate to the "Commission from time to time, as public convenience, interest, or necessity requires" to enact "such rules and regulations and prescribe such restrictions and conditions . . . as may be necessary to carry out the provisions of this chapter . . . ."[145] The demands of public interest are prime considerations for the Commission in granting licenses,[146] renewing licenses,[147] and modifying them.[148] Additionally, station operation must be carried out in the public interest.[149]

This mandate to the FCC to assure that broadcasters operate in the public interest is a broad one, a power "not niggardly but expansive," National Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), whose validity we have long upheld. FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940); FCC v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); FRC v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166 (1933). It is broad enough to encompass these regulations.[150]

As the Supreme Court has held specifically that the personal attack "regulations . . . are [not] beyond the scope of the congressionally conferred power to assure that stations are operated by those whose possession of a license serves 'the public interest,'"[151] this leaves us only to examine the adequacy of the Commission's holding in the instant case.[152]

The facts in this case indicate, as the Commission found, that the licensee demonstrated complete disregard for the rules in this area. There are instances on the record where the licensee totally failed to give any notification to persons attacked,[153] in other cases there were failures to send tapes, transcripts, or summaries.[154] The Commission found, adopting the Examiner's decision, that

[m]anagement did very little to comply with the mandate of the rules in supplying tapes or summaries. Usual-

---

143. 395 U.S. at 378–379, 89 S.Ct. at 1800, 23 L.Ed.2d 371.

144. *Id.* at 379–386, 89 S.Ct. 1794.

145. 47 U.S.C. §§ 303, 303(r) (1970).

146. 47 U.S.C. §§ 307(a), 309(a) (1970).

147. 47 U.S.C.A. § 307 (1970).

148. *Id.*

149. 47 U.S.C. § 307(d) (1970).

150. 395 U.S. at 380, 89 S.Ct. at 1801.

151. *Id.* at 386, 89 S.Ct. at 1804.

152. For a description of the Commission's factual findings see pp. 37, 38, *supra.*

153. *See, e. g.,* J.A. Vol. II, 236a.

154. July Decision, *supra,* at ¶ 18.

ly the individual was obliged to request a tape and, even then, he had difficulty.[155]

This is a demonstration of Brandywine's degree of compliance in regard to personal attacks. We have reviewed the alleged attacks in this case and find many instances of attacks upon honesty, character, integrity and other personal qualities of given persons or groups in the course of discussion of controversial issues of public importance. Yet we find that the licensee did not send tapes, that it did not send transcripts, that it did not send summaries. Is this the responsible behavior of an earnest licensee?

As was the case with regard to the fairness doctrine, Brandywine was informed of its responsibilities in personal attack situations by the Commission at the time of approving the initial transfer. Brandywine represented to the Commission that they understood and would abide by the responsibilities placed on them. As the Commission stated:

> The unavoidable conclusion is that Brandywine simply ignored its plain duty to the public. . . . We note here again that these violations, although they would warrant the same conclusion in any event, are particularly reprehensible in light of the fact that the licensee had been cautioned at the outset concerning its duties in this area.[156]

Brandywine has attempted to pass its obligations in this area to those who purchase time from the licensee. The law is clear in this regard. The obligation rests squarely on the shoulders of the licensee. The fact that the licensee decided to act in avoidance of this obligation by seeking to delegate a non-delegable duty is another indicia of Brandywine's failings under the law. We fully understand Brandywine's two pronged defense in this area. Firstly, Brandywine claims it is incapable of screening tapes prior to broadcast be-

cause of the small size of its staff. We note that small staffs in no way exculpate licensees from their affirmative duties. Brandywine would be incapable of operating without an engineer; similarly, a person suitable to protect the rights of the listening public is a necessity for a licensee. This is part of the expense of operating a radio station. Any economic argument to the contrary loses sight of the purposes of Commission regulation.

Brandywine's second assertion is even less valid. John Norris testified that the station did not have anyone listen to program tapes prior to broadcast as this act would constitute censorship.[157] This argument offends the sensibilities of the court for various reasons. This is *prima facie* evidence that despite the numerous and lengthy assertions of the licensee to the Commission, Brandywine never intended to comply with the personal attack rules. Any representation to the contrary on the part of the licensees can only be said to constitute a gratuitous design intended to lull the Commission into a feeling of security. Brandywine has dealt with the Commission in a setting which not only lacked good faith but was also meant to defraud the Commission with regard to the licensee's actual intentions in this area. Brandywine was aware of the personal attack rules, it acknowledged responsibility under them and then chose to disregard them under a guise claiming that the rules constitued licensee censorship. Such maneuvering has proven to be not so wise gamesmanship on the part of licensee. Brandywine's abuses in this area are so blatant as to be sufficient to shock the conscience of the court. The Commission had every justification for its findings in regard to the personal attack rules.

## IV. BRANDYWINE'S PROGRAM REPRESENTATIONS .

This aspect of the case, while not the most troublesome, is clearly the

155. *Id.*

156. *Id.* at ¶ 22.

157. *See* footnote 74, *supra.*

most disturbing to the court. The facts in this area, as with the other areas of this case, were clearly set out by the Commission.[158] Brandywine made extensive representations to the Commission about the types of programs to be broadcast, as well as providing specific. titles. Variation from the typical program schedule presented would not have been fatal if the changes had proven relatively minor or had they been implemented in good faith. Unfortunately, but not surprisingly, neither was the case.

The changes which took place on WXUR within the very first days following the transfer show a common design on the part of the licensee to engage in deceit and trickery in obtaining a broadcast license. Within nine days a totally unexpected group of seven programs, each of a nature different than those on the typical program schedule, were on the air. These programs, which Norris characterized as the "Hate Clubs of the Air," replaced programs which were predominantly entertainment oriented. The speed with which these changes took place can lead the court to one conclusion and one conclusion only —Brandywine intended to place these controversial programs on the air from the first but feared to so inform the Commission lest the transfer application be denied. This approach was foolish. As the Commission stated in the *Borst Decision* and as we stated earlier in this opinion,

> [t]he Commission is wisely forbidden from choosing "among applicants on the basis of their political, economic or social views."[159]

The initial representation to the Commission was obviously "a best foot forward" effort by the licensee. The licensee feared that the truth would keep the license from being granted to it. There-

fore, Brandywine sought through subterfuge to gain its license and then proceed to broadcast the type of material it believed to be most suitable—the type of material which would forward the ends of the fundamentalist movement—in utter disregard for either the public or their earlier representations to the Commission.

The second misrepresentation concerns *Interfaith Forum*. We have previously described the show at length [160] and need not reiterate here. The facts are simple —when it appeared from Commission inquiry that a more balanced approach to the question of religion was necessary the principal parties at Brandywine devised this program. The record shows that only after being censured by the local government did the licensee make any effort for this program to be broadcast, and even when it finally found its way to the airwaves its content was without resemblance to those representations made to the Commission. This was never an interfaith dialogue but rather an interview program of students and faculty at the Faith Theological Seminary. We find no fault with such a program but we fail to see how it complies with Brandywine's representations for dialogue between the faiths.

The applicable legal standard here was laid down by the Supreme Court over twenty-five years ago. In another communications case the Court said:

> The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones.[161]

This is dispositive of this issue.

■ This is a case in which the blind need for a radio outlet in the Philadelphia market has led men experienced in the broadcast industry to misrepre-

---

158. For a discussion of the pertinent facts see pp. 33, 34 and 38, *supra.*

159. *See* note 15, *supra.*

160. This program is described at p. 23, *supra.*

161. F.C.C. v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946).

sent the facts and to attempt to deceive a regulatory body all to a single end—propagation on the media of their philosophic dogma. These men may have possessed the highest aims for their cause but these aims were blind to the needs of the general public. Misrepresentations conceived to win a soap-box from which to shout one's views are the basest over-exaggeration of the liberties guaranteed in the first amendment. Since the airwaves are a scarce commodity and have been deemed a public trust it is easy for us to see that Dr. McIntire and his followers have every right for their views to be broadcast. Their right to operate a radio station is no different than the rights of any other group in America. Their rights are neither superior nor inferior. In seeking a broadcast station they had to meet the same requirements as anyone else seeking a license. The first of these requirements is candor and honesty in representations to the Commission. Their dismal failure in this regard is evidenced by this 8,000 page record. These men, with their hearts bent toward deliberate and premeditated deception, cannot be said to have dealt fairly with the Commission or the people in the Philadelphia area. Their statements constitute a series of heinous misrepresentations which, even without the other factors in this case, would be ample justification for the Commission to refuse to renew the broadcast license.

## V. FIRST AMENDMENT CONSIDERATIONS

The most serious aspect of this case relates to the basic freedoms of speech and press which are essential guarantees of the first amendment. This is the area of greatest concern to the court. Any shortcomings in this area would necessitate our reversing the decision of the Commission. Not only must the Commission take a hard look at the case in this light but so must this court.

### A. Historical Perspective

#### 1. Freedoms of Speech and Free Press

The original draft of the federal Constitution was, curiously enough, silent on the question of freedom of the press. We say "curiously" because among the burning issues of the revolution and the colonial quest for freedom were the plight of Peter Zenger, who had been denied this right, and the issue of taxation of the press. So great was the concern of America that Alexander Hamilton was prompted to write the following:

> On the subject of the liberty of the press, as much as has been said, I cannot forbear adding a remark or two: in the first place, I observe, that there is not a syllable concerning it in the constitution of this State; in the next, I contend, that whatever has been said about it in that or any other State amounts to nothing. What signifies a declaration, that "the liberty of the press shall be inviolably preserved"? What is the liberty of the press?[162]

The response to Hamilton's complaint was not long in coming. This wrong was remedied almost immediately by the first amendment to the Constitution.

### AMENDMENT 1

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The following passage from Blackstone's Commentaries is most instructive:

> The liberty of the press is, indeed, essential to the nature of a free state; but this consists in laying no *previous* restraints upon publication, and not in freedom from censure for criminal matter when published. Every free-

---

162. A. Hamilton, Federalist Papers, No. 84.

man has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge in all controverted points in learning, religion and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall on a fair and impartial trial be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundation of civil liberty. Thus the will of the individuals is still left free; the abuse only of the free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry; liberty of private sentiment is still left; the disseminating, or making public, of bad sentiments, destructive to the ends of society, is the crime which society corrects.[163]

This was the common law in Blackstone's time. The framers of the first amendment were devoid of any intent to change the common law in this respect. Mr. Justice Frankfurter provides an excellent lesson in his opinion in *Dennis*.[164]

The historic antecedents of the First Amendment preclude the notion that its purpose was to give unqualified immunity to every expression that touched on matters within the range of political interest. The Massachusetts Constitution of 1780 guaranteed free speech; yet there are records of at least three convictions for political libels obtained between 1799 and 1803. The Pennsylvania Constitution of 1790 and the Delaware Constitution of 1792 expressly imposed liability for abuse of the right of free speech. Madison's own State put on its books in 1792 a statute confining the abusive exercise of the right of utterance. And it deserves to be noted that in writing to John Adams's wife, Jefferson did not rest his condemnation of the Sedition Act of 1798 on his belief on unrestained utterance as ' to political matter. The First Amendment, he argued, reflected a limitation upon Federal power, leaving the right to enforce restrictions on speech to the States. * * *[165] "The law is perfectly well settled," this Court said over fifty years ago, "that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guarantees and immunities which we had inherited from our English ancestors, and which had from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case. In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed."[166] That this represents the authentic view of the Bill of Rights and the spirit in which it must be construed has been recognized again and again in cases that have come here within the last fifty years.[167]

---

163. 4 W. Blackstone, Commentaries, *151–52 (emphasis in original) (footnote omitted).

164. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

165. *Id.*, 341 U.S. at 521–522, 71 S.Ct. at 873 (footnotes omitted).

166. *Id.*, 341 U.S. at 524, 71 S.Ct. at 874, *citing* Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897).

167. *Id.*, *citing* Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115 (1914).

This situation was not even thought to have been altered by the fourteenth amendment until relatively recently. Speaking for the Court in 1907, Mr. Justice Holmes stated:

We leave undecided the question whether there is to be found in the Fourteenth Amendment a prohibition similar to that in the 1st. But even if we were to assume that freedom of speech and freedom of the press were protected from abridgment on the part not only of the United States but also of the states, still we should be far from the conclusion that the plaintiff in error would have us reach. In the first place, the main purpose of such constitutional provisions is "to prevent all such *previous restraints* upon publications as had been practiced by other governments," and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. Commonwealth v. Blanding, 3 Pick. 304, 313, 314; Respublica v. Oswald, 1 Dall. 319, 325, 1 L.Ed. 155. The preliminary freedom extends as well to the

While the courts have from an early date taken a hand in crystallizing American conceptions of freedom of speech and press into law, it is scarcely in the manner or to the extent which they are frequently assumed to have done. The great initial problem in this realm of constitutional liberty was to get rid of the common law of "seditious libel" which operated to put persons in authority beyond the reach of public criticism. The first step in this direction was taken in the famous, or infamous, Sedition Act of 1798, which admitted the defense of truth in prosecution brought under it, and submitted the general issue of defendant's guilt to the jury. But the substantive doctrine of "seditious libel" the Act of 1798 still retained, a circumstance which put several critics of President Adams in jail and thereby considerably aided Jefferson's election as President in 1800. Once in office, nevertheless, Jefferson himself appealed to the discredited principle against partisan critics. Writing his friend Governor McKean of Pennsylvania in 1803 [about] such critics, Jefferson said: "The federalists having failed in destroying freedom of the press by their gag-law, seem to have attacked it in an opposite direction; that is by pushing its licentiousness and its lying to such a degree of prostitution as to deprive it of all credit. * * * This is a dangerous state of things, and the press ought to be restored to its credibility if possible. The restraints provided by the laws of the States are sufficient for this, if applied. And I have, therefore, long thought that a few prosecutions of the most prominent offenders would have a wholesome effect in restoring the integrity of the presses. Not a general prosecution, for that would look like persecution; but a selected one."

Works (Ford ed., 1905), IX 451–52.

In the *Memorial Edition* of Jefferson's works this letter is not included; nor apparently was it known to the Honorable Josephus Daniels, whose enthusiastic introduction to one of these volumes makes Jefferson out to have been the father of freedom of speech and press in this country, if not throughout the world. The sober truth is that it was that arch enemy of Jefferson and of democracy, Alexander Hamilton, who made the greatest single contribution toward rescuing this particular freedom as a political weapon from the coils and toils of the common law. and that in connection with one of Jefferson's "selected prosecutions." I refer to Hamilton's manytimes quoted formula in the Croswell case in 1804: "The liberty of the press is the right to publish with impunity, truth, with good motives, for justifiable ends though reflecting on government, magistracy, or individuals." People v. Crosswell [Croswell], 3 Johns. [Cas.] (N.Y.) 337. Equipped with this brocard our State courts working in co-operation with juries, whose attitude usually reflected the robustiousness of American political discussion before the Civil War, gradually wrote into the common law of the States the principles of "qualified privilege," which is a notification to plaintiffs in libel suits that if they are unlucky enough to be officeholders or office seekers, they must be prepared to shoulder the almost impossible burden of showing defendant's "special malice." Cooley, Constitutional Limitations, Chap. XII: Dawson, Freedom of the Press, A Study of the Doctrine of "Qualified Privilege" (1924).

Corwin, Liberty Against Government, 157–59 n. 65 (1948).

false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in most cases, if not in all. Commonwealth v. Blanding, *ubi supra*; 4 Bl. Com. 150.[168]

This would appear to be an unqualified endorsement of the views espoused by Blackstone. However, Justice Holmes remarked in the same opinion, "There is no constitutional right to have all general propositions of law once adopted remain unchanged."[169] As late as 1922, the Court, speaking through Mr. Justice Pitney, stated: "[N]either the Fourteenth Amendment nor any other provision of the Constitution of the United States imposes upon the States any restriction about 'freedom of speech' or the 'liberty of silence'. . . . ."[170]

Eventually the citizens of this country were given those long sought protections for substantive personal rights. This was achieved by identifying these rights with "liberty" which States were without power to abridge without due process of law. This disclosure was made quite casually by the Supreme Court in the landmark decision of Gitlow v. New York.[171] "For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental principle rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from im-

pairment by the States."[172] Within two years this *dictum* became accepted doctrine as to freedom of speech.[173] Four years later freedom of the press was incorporated.[174]

## 2. *Censorship*

Let us also consider the first amendment and the concept of censorship—an implicit issue in this case.

Mr. Justice Murphy asserted in Chaplinsky v. New Hampshire: [175]

There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighted by the social interest in order and morality.[176]

Similarly, in West Virginia State Board of Education v. Barnette [177] Mr. Justice Jackson established it as "a commonplace that censorship or suppression of expression of opinion is tolerated by our Constitution only when the expression presents a clear and present danger of action of a

---

168. Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 557, 51 L.Ed. 879 (1907) (emphasis in the original).

169. *Id.*, 205 U.S. at 461, 27 S.Ct. at 557.

170. Prudential Insurance Co. of America v. Cheek, 259 U.S. 530, 543, 42 S.Ct. 516, 522, 66 L.Ed. 1044 (1922).

171. 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). In this case the Court affirmed Gitlow's conviction for violating a New York statute which prohibited advocating criminal anarchy.

172. *Id.*, 268 U.S. at 666, 45 S.Ct. at 630.

173. Fiske v. Kansas, 274 U.S. 380, 47 S. Ct. 655, 71 L.Ed. 1108 (1927).

174. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).
The fourteenth amendment has also been extended to the first amendment guarantees of freedom of religion, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and the right of peaceable assembly, DeJonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937).

175. 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

176. *Id.*, 315 U.S. at 571–572, 62 S.Ct. at 769 (footnotes omitted).

177. 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

kind the State is empowered to prevent and punish." [178]

Significantly, those cases which have sanctioned previous restraints of the utterances of specific individuals have not involved restraints by administrative action, but rather judicial restraints. It was a prime objective of those seeking to ban previous restraints to outlaw censorship which could be accomplished through licensing. It was in this setting that John Milton directed his offensive in his *Appeal for the Liberty of Unlicensed Printing*. Freedom of the press was, in the beginning, a right to publish " '*without* a license what formerly could be published only *with* one.' "[179] Today, as well, nothing is more likely to give rise to judicial condemnation than a licensing requirement. Only in those cases in which the licensing officer's authority is so limited as to make discrimination against utterances which he disapproves of impossible [180] will the court refrain from interfering. The Supreme Court has even gone so far as to strike down licensing ordinances with respect to forms of communication which are totally forbidden.[181] More pertinently to the case at bar, in the area of radio broadcasting, where the very physical limitations of the medium make this form of communication unavailable to all who would utilize it, the Court has sanctioned the Commission's power of selective licensing.[182] On the other hand, it had been the Court's position until re-cently, with regard to motion pictures, that the state's power to license, and therefore, to censor, films to be shown locally was unrestricted as "a business pure and simple, originated and conducted for profit," and "not to be regarded, . . . as part of the press of the country, or as organs of public opinion." [183] This doctrine, established in 1915, was altered by the Court in 1948. Mr. Justice Douglas stated that the Court's position had become a very different one. "We have no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment."[184]

It would be remiss for us to move on without noting that there are areas where the federal government has, at one time or another, placed restraints on both freedoms of speech and press. These areas include, or have included, censorship of the mails, *e. g.*, fraud orders and obscenity; regulation of business and labor activities; regulation of political activities by federal employees; legislation to protect the armed forces and the war power; loyalty regulations; the Smith Act; and the registration of subversive organizations.

B. *The First Amendment and Red Lion*

The rights of free speech and free press coupled with the fairness doctrine and the Supreme Court's *Red Lion* decision, is one of the most written-about

178. *Id.*, 319 U.S. at 633, 63 S.Ct. at 1183.

179. Lovell v. Griffin, 303 U.S. 444, 451, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) (emphasis in the original) (footnote omitted).

180. Chaplinsky v. New Hampshire, *supra;* Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

181. Lovell v. Griffin, *supra;* Hague v. C.I.O., 307 U.S. 496, 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ; Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) ; Cantwell v. Connecticut, *supra;* Largent v. Texas, 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873 (1943) ; Thomas v. Collins, 323 U.S. 516, 538, 65 S.Ct. 315, 89 L.Ed. 430 (1945) ; Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

182. Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933) ; Federal Communications Commission v. N. B.C., 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943).

183. Mutual Film Corp. v. Ohio Indus'l Comm., 236 U.S. 230, 244, 35 S.Ct. 387, 391, 59 L.Ed. 552 (1915).

184. United States v. Paramount Pictures, 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

areas in the law today.[185] The first amendment issue was dealt with by the Supreme Court in part three of the *Red Lion* decision.[186] The Court explained the broadcaster's contentions as follows:

> Their contention is that the First Amendment protects their desire to use their allotted frequencies continuously to broadcast whatever they choose, and to exclude whomever they choose from ever using that frequency. No man may be prevented from saying or publishing what he thinks, or from refusing in his speech or other utterances to give equal weight to the views of his opponents. This right, they say, applies equally to broadcasters.[187]

These first amendment challenges were rejected by the Court unanimously.[188] In fact, Mr. Justice White found that the Commission's application of the fairness doctrine enhances rather than abridges the freedoms of speech and press.[189] As we noted previously, one of those points emphasized by the Court was "the scarcity of broadcast frequencies, the Government's role in allocating those frequencies, and the legitimate claims of those unable without governmental assistance to gain access to those frequencies for expression of their views . . . ."[190]

In direct response to the first amendment claims raised by the broadcasters the Court stated:

> Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish. . . . It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. . .
>
> It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.[191]

The Court found, and of course we agree, that it would be "a serious matter" if the requirements imposed by the Commission would in effect induce the licensee to censor themselves thereby making their coverage of controversial public issues "ineffective." However, the Court deemed this to be merely a speculative possibility. In fact the Court determined that if licensees

should suddenly prove timorous, the Commission is not powerless to insist

---

185. It would be impossible to provide a complete bibliography of law review materials in the space available here. At the risk of omitting far more than we can include we call the reader's attention to the following: Symposium, Media and the First Amendment in a Free Society, 60 Geo.L.J. 871–1099, particularly, 1031–44 (1972); Johnson & Western, A Twentieth Century Soapbox: The Right to Purchase Radio and Television Time, 57 Va.L.Rev. 574 (1971); Note, Fairness Doctrine: Television as a Marketplace of Ideas, 45 N.Y.U.L.Rev. 1222 (1970); Cahill, "Fairness" and the FCC, 21 Fed.Comm.B.J. 17 (1967); Lynd, Banzhaf v. FCC: Public Interest and the Fairness Doctrine, 23 Fed.Comm.B.J. 39 (1969); Note, Concepts of the Broadcast Media Under the First Amendment:

A Reevaluation and a Proposal, 47 N.Y. U.L.Rev. 83 (1972); Note, We Pick 'Em, You Watch 'Em: First Amendment Rights of Television Viewers, 43 S.Cal.L.Rev. 826 (1970); Note, Free Speech and the Mass Media, 57 Va.L.Rev. 636 (1971).

186. 395 U.S. at 386–401, 89 S.Ct. 1794, 23 L.Ed.2d 371.

187. *Id.* at 386, 89 S.Ct. at 1804.

188. Mr. Justice Douglas did not participate in the disposition of the case.

189. 395 U.S. at 393–394, 89 S.Ct. 1794.

190. *Id.*, 395 U.S. at 400, 89 S.Ct. at 1812.

191. *Id.*, 395 U.S. at 388–390, 89 S.Ct. at 1806.

that they give adequate and fair attention to public issues. It does not violate the First Amendment to treat licensees given the privilege of using scarce radio frequencies as proxies for the entire community, obligated to give suitable time and attention to matters of great public concern.[192]

The Court was careful to point out that its rejection of the broadcaster's claim was not an absolute one. The Court found that there could be instances in which more substantial first amendment questions were raised than in *Red Lion.* For example, the Court found no evidence of Commission "refusal to permit the broadcaster to carry a particular program," or "of the official government view dominating public broadcast-casting." [193]

## C. *The Post Red Lion Era*

In the short time that has passed since the *Red Lion* case, there has been an ever growing number of cases decided concerning the fairness doctrine, broadcasting, and the first amendment. We have already considered many of these cases during the course of our discussion of the fairness doctrine. Thus, a lengthy exposition here is unwarranted and unnecessary. For the most part these cases have relied primarily, as they must, on *Red Lion* and have added little to the shape of the law.

One opinion which did provide instructional enlightenment in the first amendment area is Judge Wright's scholarly opinion in Business Executives' Move for Vietnam Peace v. F. C. C.[194] Judge Wright addressed the issue of the uncertainty of the scope of the first amendment's impact on the broadcast media:

It has always been clear that the broadcast media—so vital to communication in our society—are affected by strong First Amendment interests.[195] Yet the nature of those interests has not been so clear; and evolution of constitutional principles in this area is still very much in progress. . . . [*Red Lion*] justified the Commission's interference with broadcasters' free speech by invoking specifically constitutional rights of the general public which, it said, underlie and support the fairness doctrine rules at issue. Issuing what must become a clarion call for a new public concern and activism regarding the broadcast media, the Court stated that "the people as a whole retain their . . . collective right to have the medium function consistently with the ends and purposes of the First Amendment." [196] It went on to say:

". . . The right of free speech of a broadcaster . . . does not embrace a right to snuff out the free speech of others. . . .

\* \* \* \* \* \*

. . . [A] licensee has no constitutional right . . . to monopolize a radio frequency to the exclusion of his fellow citizens. . . .

\* \* \* \* \* \*

. . . It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." [197]

192. *Id.,* 395 U.S. at 393–394, 89 S.Ct. at 1808.

193. *Id.,* 395 U.S. at 396, 89 S.Ct. at 1809.

194. 146 U.S.App.D.C. 181, 450 F.2d 642 (1971).

195. *See, e. g.,* United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Congress itself has prohibited any interference by the Commission with "the right of free speech by means of radio communication." 47 U.S.C. § 326 (1964).
*Id.,* 146 U.S.App.D.C. at 188, 450 F.2d at 649 (footnote renumbered).

196. *Id.,* 146 U.S.App.D.C. at 188–189, 450 F.2d at 649–650, *citing* 395 U.S. at 390, 89 S.Ct. 1794 (footnote renumbered).

197. *Id.,* 146 U.S.App.D.C. at 189, 450 F.2d F.2d at 650, *citing* 395 U.S. at 387, 390, 89 S.Ct. 1794.

Even in light of the later cases *Red Lion* remains the definitive opinion in the area. Therefore, we can only stress, once again, the Court's language in that case. As we said in Democratic National Committee v. F.C.C.: [198]

> According to the Court in [*Red Lion*], the primary concern in the broadcast industry is "the First Amendment goal of producing an informed public capable of conducting its own affairs." [199]

We expressed this same view in the following terms:

> In our view, the essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that *the American public must not be left uninformed.* [200]

Anything else on this point would be superfluous.

D. *The Prohibition Against Censorship*

It was John Stuart Mill who wrote:

> [Censorship] is as noxious, or more noxious, when exerted in accordance with public opinion, than when in opposition to it. If all mankind minus one were of one opinion, and only one person were of a contrary opinion, mankind would be no more justified in silencing that one person, than he, if he had the power, would be justified in silencing mankind. [201]

These views are central to the thoughts of all who hold dear our fundamental liberties. Wisely, therefore, Congress has specifically forbidden the Commission from engaging in any actions which would constitute censorship.

§ *326. Censorship.*

Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication. [202]

It has been held that this section denied the power to censor to the states in the same terms as it denied the power to censor to the federal government; [203] and similarly that the licensee shall have the sole power in choosing programs. [204] However, this court has held that the Commission's public interest rulings, with reference to specific program content, do not invariably constitute "censorship" within the confines of § 326. [205] We have also held that not every condition imposed by the Commission on a licensee constitutes interference with free speech. [206]

The deep seated commitment which the courts and commission share for this concept can hardly be classified as ephemeral. The prohibition from censorship has been and will continue to be carefully guarded by those charged with the responsibility of protecting our basic freedoms. Yet, despite the guarantees there are those who fear government licensing of broadcasting and believe that it constitutes a threat to freedom of in-

198. *Supra.*

199. *Id.,* 148 U.S.App.D.C. at 401, 460 F.2d at 909, *citing* 395 U.S. at 392, 89 S.Ct. 1794.

200. Green v. F.C.C., *supra,* 144 U.S.App. D.C. at 359, 447 F.2d at 329 (emphasis in the original).

201. J. Mill, On Liberty 274.

202. 47 U.S.C. § 326 (1970).

203. Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153 (3rd Cir. 1950), cert. denied, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951).

204. McIntire v. Wm. Penn Broadcasting Co. of Philadelphia, 151 F.2d 597 (3rd Cir. 1945), cert. denied, 327 U.S. 779, 66 S.Ct. 530, 90 L.Ed. 1007 (1946).

205. Banzhaf v. F.C.C., 132 U.S.App.D.C 14, 405 F.2d 1082 (1968), cert. denied, American Broadcasting Companies v. F.C.C., 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Carter Mountain Transmission Corp. v. F.C.C., 116 U.S. App.D.C. 93, 321 F.2d 359 (1963), cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1964).

206. Idaho Microwave, Inc. v. F.C.C., 122 U.S.App.D.C. 253, 352 F.2d 729 (1965).

formation. One such person is media commentator Walter Cronkite:

> That brings me to what I consider the greatest threat to freedom of information: the Government licensing of broadcasting. Broadcast news today is not free. Because it is operated by an industry that is beholden to the Government for its right to exist, its freedom has been curtailed by fiat, by assumption, and by intimidation and harassment.

> Broadcasting's freedom has been curtailed by fiat through rulings of the Supreme Court. The Court has stated that as long as we are licensed by the Government, we are not as free as the printed press and therefore not eligible in the same manner for the first amendment guarantees. The father of all such restrictive rulings is the decision in National Broadcasting Co. v. United States, where the Court found that freedom of utterance was abridged to anyone who wanted to use the limited facilities of radio. The Court went on to find that radio was unlike other modes of expression in that it was not available to all. It was this unique characteristic that distinguished the radio from other forms of expression and made it a subject of government regulation. More recently, the Supreme Court's ruling in Red Lion Broadcasting Co. v. FCC upheld the "personal attack rule" and found that where substantially more individuals wish to broadcast than there are frequencies available to allocate, it is idle to attempt to establish an unabridgeable first amendment right to broadcast comparable to the right of each individual to speak, write, or publish.

> Stripped of this constitutional protection, broadcast news stands naked before those in power, now or in the future, who, for whatever motive, would like to see its freedom restrained.[207]

While we do not agree with Mr. Cronkite's conclusions, we do share his concern. Journalists and broadcasters have no monopoly over concern with censorship. The courts, and indeed the American public as a whole, have a tremendous stake in a free press and an informed citizenry. Yet, how can the citizenry remain informed if broadcasters are permitted to espouse their own views only without attempting to fully inform the public? This is the issue of good faith which, unfortunately, a small number of broadcasters refuse to exercise.

### E. *Brandywine and the First Amendment*

██ Under the state of the law as it exists today, we can find no infirmity with the Commission's findings or conclusions in light of the first amendment. Commission findings in this area are in a relatively narrow sphere. The alleged violations of fairness and personal attack rules are fully documented. The abuses are flagrant. The sanctions borne of the litigation were based on continuous refusals by the licensee to meet its obligations. This is not a case in which the Commission is acting on an isolated mistake, or two, in the course of a three year license period. This is a case of deliberate and continuing disregard in a short time period spanning only several months. The Commission has made no attempt to influence WXUR's programming or censor its programming in general or specifically. Had the licensee met the obligations required of it we have no reason to believe that Brandywine would have met with any difficulty. The law places requirements on licensees as fiduciaries. Failure to live up to the trust placed in the hands of the fiduciary requires that a more responsible trustee be found. This is not the public's attempt to silence the trustee—it is the trustee's attempt to silence the public. This is not the public censoring the trustee—it is the trustee

---

207. Cronkite, Introduction to Part III: Points of Conflict—Legal Issues Con- fronting Media Today, 60 Geo.L.J. 1001, 1003–04 (1972).

censoring the public. Attempting to impose the blame on the Commission for its own shortcomings can only be likened to the spoiled child's tantrum at being refused a request by an otherwise overly-benevolent parent.

As in the *Red Lion* case, we note that other questions in this area could pose more serious first amendment problems. Since such questions are not at issue here there is no need to hypothecate upon them.

## VI. SANCTIONS

In light of the extensive violations found by the Commission in the areas of the fairness doctrine, the personal attack rules, and misrepresentation of program plans, the Commission refused to renew Brandywine's license. The Commission, while finding that its action would have been justified when based on any of these areas, chose to base its opinion on a consideration of Brandywine's total performance.

 As the Commission stated in Letter to Honorable Oren Harris,[208] the question of whether the licensee is operating in the public interest, the established standard for license renewal,[209] is determined at the time of renewal. At this time the Commission must take the licensee's total performance into account, including its adherence to the fairness doctrine. Of course, the prime consideration must come back to the effectiveness of the licensee in his role as trustee for the public.

 As Judge Wright points out in Citizens Communications Center v. F. C. C.: [210]

The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license. Licenses are limited to a maximum of three years' duration, may be revoked, and need not be renewed. Thus the channels presently occupied remain free for a new assignment to another licensee in the interest of the listening public.

Plainly it is not the purpose of the Act to protect a licensee against competition but to protect the public.

*Cf.* Greater Boston Television Corp. v. F. C. C.,[211] "[The Federal Communications Act] does not reflect the same concern for 'security of certificate' that appears in other laws." [212] Both *Greater Boston* and *Citizens Communications* make it clear that the Commission can act to provide assurances of better broadcasting by taking licenses from those who fail to provide for the public interest.

The Commission need not be confined to the technique of exercising regulatory surveillance to assure that licensees will discharge duties imposed on them, perhaps grudgingly and perhaps to the minimum required. It may also seek in the public interest to certify as licensees those who would speak out with fresh voice, would most naturally initiate, encourage and expand diversity of approach and viewpoint.[213]

Judge Leventhal recently enunciated the standard for reviewing decisions of regulatory agencies in these terms:

We recognized the tension between the doctrine of judicial restraint, which requires of us considerable deference to agency decisions, and the practical necessities of judicial review, which require a minimum standard of articulation, so that we may discern the path which the Commission took on the way to its result. We acknowl-

208. 40 F.C.C. 582 (1963).

209. 47 U.S.C. § 307(a), (d) (1970).

210. 145 U.S.App.D.C. 32, 40 fn. 23, 447 F.2d 1201, 1209 fn. 23 (1971), *quoting* F.C.C. v. Sanders Bros. Radio Station, 309 U.S. 470, 475 (1940).

211. 143 U.S.App.D.C. 383, 444 F.2d 841 (1970).

212. *Id.*, 143 U.S.App.D.C. at 396, 444 F.2d at 854.

213. *Id.*, 143 U.S.App.D.C. at 402, 444 F.2d at 860.

edged the impossibility of framing a universally applicable formula "for deciding when an agency . . . has crossed the line from the tolerably terse to the intolerably mute. . ."[214]

■ The Commission's opinion in this case exemplifies the type of findings which this court would like to see in all its cases. The opinion is complete, thorough, thoughtful and carefully based on the law. The sanction imposed by the Commission is fully supported by the record. We can find no justification for upsetting a sanction so well substantiated by the record and the findings of the Commission.

■ Of course, as we have previously pointed out, these sanctions did not befall Brandywine by surprise. The *Borst Decision* contained a warning to the licensee designed to alert him to the Commission's expectations; this warning was acknowledged by the licensee. The Commission can only inform and advise as to the law; it cannot coerce a licensee to comply.

## VII. CONCLUSION

Finally, we come to the end of our long journey. Yet, we take a brief moment to comment on the path we have travelled. Appellants requested at oral argument that the court not rely alone on the cold submissions in the pleadings, but that we carefully review the entire record in this case. We have done so fastidiously—we have left no corner unturned; no fact has gone unconsidered. What we found teaches many lessons.

Appellants have blazed a trail marked by empty promises and valueless verbiage. They have attempted to prevail by wearing down both Commission and court. However, those charged with protecting the precious rights of the public will not, and cannot, be exhausted by a group of recalcitrants who attempt to cajole and bully. Freedom of speech is not an empty slogan or a rallying cry —nor can it be snatched from the hands of the American people by an outpour-

ing of emotional indignation. Freedom of speech is a truth that we have long held to be self-evident; we refuse to sit by idly and watch that truth snuffed out by a group of overly-zealous men whose sole interest is filling the airwaves with their own views to the exclusion of the views of all others. Dr. McIntire and his followers have every right to air their views; but so do the balance of our two-hundred-and-ten-million people.

Brandywine was given every opportunity to succeed in the broadcast endeavor on which it set out. The Commission fulfilled its duty in granting the initial license although it may have proven more popular and expedient to bow to the protestations of Brandywine's detractors. The Commission forewarned Brandywine about its fairness doctrine and its personal attack rules and made every effort to explain them. Despite the Commission's sanguine outlook it was soon evident that Brandywine refused to comply with those requirements, which are designed to serve the public interest and the broadcast audience. Commission good faith was interpreted as an act of weakness.

The first amendment was never intended to protect the few while providing them with a sacrosanct sword and shield with which they could injure the many. Censorship and press inhibition do not sit well with this court when engaged in by either the Commission or by a defiant licensee. The most serious wrong in this case was the denial of an open and free airwave to the people of Philadelphia and its environs.

Consequently, the opinion of the Federal Communications Commission is

Affirmed.

J. SKELLY WRIGHT, Circuit Judge, concurring:

Judge Tamm's opinion contains a careful articulation of the facts of this case and an excellent exposition of the applicable law. While I am not necessarily in agreement with all his apprais-

214. WAIT Radio v. F.C.C., 148 U.S.App.D.C. 148, at 179, 459 F.2d 1203, at 1204 (1972).

als of the actions of the people concerned with this litigation, including counsel and the hearing examiner, I concur in his decision affirming the Commission on the ground that substantial evidence supports the Commission's finding that appellant misrepresented its program plans and thus consciously deceived the Commission. This finding was a separate ground for denial of renewal by the Commission.

If this case did not involve an unpopular fundamentalist preacher, for me it would be an easy one indeed. The application to transfer the WXUR license was granted on specific representations of appellant as to programming and with a special warning that appellant must comply with its responsibilities under the law as a public licensee. The Commission felt that a special warning was required because opponents of the transfer, representing a substantial segment of the public served by the license, strongly argued that appellant, if granted the license, would not comply with the law. In spite of the warning and the circumstances surrounding the transfer generally, appellant proceeded to treat its public license as though it were its private property unencumbered by public obligations. It not only deceived the Commission as to its programming, but it ignored the Commission's warning with respect to fairness in the operation of the station. In effect it simply defied the Commission. Under the circumstances the Commission's action unquestionably has substantial support in the record. Universal Camera Corp v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

But because the Commission's ruling has the possible effect of suppressing the ventilation of views with which there might be substantial disagreement, its action in denying renewal of the license requires particularly careful scrutiny. As Judge Tamm's opinion makes clear, in such a case it is not enough simply to find that substantial evidence in the record taken as a whole supports the Commission and there was no abuse of discretion. In these circumstances the court itself should make its own evaluation of the evidence to insure that First Amendment freedoms of the licensee and the public are fully and fairly taken into account in the decision making process. *See* Jacobellis v. Ohio, 378 U.S. 184, 187–190, 84 S.Ct. 1676, 12 L. Ed.2d 793 (1964); New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Niemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951); Bridges v. California, 314 U.S. 252, 271, 62 S.Ct. 190, 86 L.Ed. 192 (1941). So doing, I cannot say that the Commission erred in denying the renewal application in this case.

Chief Judge BAZELON concurs in affirming the decision of the FCC solely on the ground that the licensee deliberately withheld information about its programming plans. A full statement of his views will issue at a later date.

PER CURIAM:

On September 25, 1972, the judgment of this court was filed affirming the action of the Commission in this case on the ground of deception in the acquisition of a broadcasting license. Chief Judge Bazelon also concurred "in affirming the decision of the FCC solely on the ground that the licensee deliberately withheld information about its programming plans." He stated further that "[a] full statement of his views will issue at a later date."

Chief Judge Bazelon now files a dissenting opinion. That opinion follows immediately on p. 63. Circuit Judge J. SKELLY WRIGHT files a response, with the concurrence of Circuit Judge TAMM, which follows on p. 80.

BAZELON, Chief Judge, dissenting:

In this case I am faced with a *prima facie* violation of the First Amendment. The Federal Communications Commission has subjected Brandywine to the supreme penalty: it may no longer operate as a radio broadcast station. In si-

lencing WXUR, the Commission has dealt a death blow to the licensee's freedoms of speech and press. Furthermore, it has denied the listening public access to the expression of many controversial views. Yet, the Commission would have us approve this action in the name of the fairness doctrine, the constitutional validity of which is premised on the argument that its enforcement will *enhance* public access to a marketplace of ideas without serious infringement of the First Amendment rights of individual broadcasters.

This paradoxical result is sustained only by a faith in the argument that, despite some short-term casualties along the way, long-term enforcement of the fairness doctrine's obligations is the only means to achieve the marketplace ideal. But if we are to go after gnats with a sledgehammer like the fairness doctrine, we ought at least to look at what else is smashed beneath our blow.

Our perception of the need for broadcasting regulation has not, in Judge Tamm's words, "seriously been questioned in over fifty years." A re-examination of the value, purposes and effects of the fairness doctrine raises for me such serious doubts about the constitutionality of its application here that I am compelled to withhold my affirmance.

Instead, I would remand to the FCC for a searching inquiry into the factual issues and alternative policies [1] raised within the constitutional framework outlined below, before we can even begin to answer the question: does silencing WXUR in the name of the fairness doctrine violate the First Amendment?

The entire field of governmental regulation of broadcast communication is so fraught with competing interests and uncertain results, and the shifting balance of First Amendment freedoms offers so few definite guidelines in this area, that there is no easy answer to this question. My Brother Tamm has written a lengthy, detailed opinion which carefully applies Commission regulations to the facts of this case; there was perhaps a time when I could concur fully with his conclusions. But I fear that ancient assumptions and crystallized rules have blinded all of us to the depth of the First Amendment issues involved here. In affirming the Commission, Judge Tamm relied on its application of the fairness doctrine and the Supreme Court's decision in *WOKO*. Judge Wright, on the other hand, relied only on *WOKO*. But I must dissent on both counts. My purpose in writing a separate opinion is to try to come to grips with the conceptual underpinnings which have led the Commission to such ironic consequences in the case before me.

## I.

I begin with a discussion of the standards according to which regulation of broadcasting by the federal government must be *judged*. And I say "judged", because it is the particular duty and function of this court to test all federal regulation of speech and press against the mandates of our Constitution. The "public interest", the standard under which the FCC operates, cannot be divorced from our contemporary understanding and interpretation of the First Amendment.

The purpose of the First Amendment is to preserve an "uninhibited marketplace of ideas."[2] Its language presupposes the general concept that the marketplace is best preserved by protecting the right of each *individual* to speak freely; that "the fitting remedy for evil counsels is good ones",[3] rather than

1. For a discussion of these policies, *see* notes 46, 51, 57 *infra*.

2. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). *See also* Emerson,

The System of Freedom of Expression (1970) [hereinafter cited as Emerson].

3. Whitney v. California, 274 U.S. 357, 375–376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927). In the words of Judge

coerced silence, or governmentally directed discussion. Thus, "the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' "[4]

Such has always been the logic behind our strict protection of the freedom of the press to disseminate news and views on public issues from the imposition of governmental burdens or regulations.[5] The First Amendment's mandate that freedom for the individual is the only means to achieve the marketplace ideal of an informed American public "[t]o many . . . is, and always will be, folly; but we have staked upon it our all." [6]

Of course, there have been exceptions to this general proposition. There is a need to accommodate other societal interests: as Mr. Justice Holmes said in Schenck v. United States, "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."[7] The government may also act affirmatively to regulate behavior which directly threatens the free speech of others.[8] New types of regulation which promote effective communication may be required: "the various forms of modern so-called 'mass communications' raise issues that were not implied in the meaning of communication known to Franklin and Jefferson and Madison."[9]

Learned Hand, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943).

4. Bridges v. California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941).

5. See New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964); N.A.A.C.P. v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed. 2d 1498 (1957).

6. United States v. Associated Press, *supra* note 3, 52 F.Supp. at 372.

7. 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). The variety of aspects of American life which are touched by the First Amendment, and the constitutional tests which have evolved, are discussed at length in Emerson. *See also* Hudon, Freedom of Speech and Press in America (1963). There is disagreement over whether a balancing test should apply at all where First Amendment rights are involved. The late Justice Black described this test as having a "freedom-destroying nature," Scales v. United States, 367 U.S. 203, 261, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). "Since that 'test' denies that any speech, publication or petition has an 'absolute' right to protection under the First Amendment, strict adherence to it would . . . mean that there would be only a conditional right, not a complete right, for any

American to express his views to his neighbors—or for his neighbors to hear those views." Konigsberg v. State Bar of California, 366 U.S. 36, 68, 81 S.Ct. 997, 1016, 6 L.Ed.2d 105 (1961).

But even Justice Black recognized *some* limits to free speech, e. g., Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), which may, in itself, suggest that some balancoing is required. *See* Nutting, Is the First Amendment Obsolete?, 30 Geo. Wash.L.Rev. 167, 171 (1961). The primary danger of broadly asserting the need to balance interests is that there is a great temptation to reduce a constitutional right to the same weight as every other interest; "moreover, it has a tendency to tip the scales against the individual," particularly where the balance sets the individual against the needs of the nation. Hudon, *supra* at 174.

Regulation of the broadcast industry is designed exclusively to promote *First Amendment goals* rather than any other national need. The public's rights are weighed against the individual's. *See* note 10, *infra.* Justice Black's admonition must be kept in mind, however, when government begins to justify the regulation of broadcast licensees on other than First Amendment grounds. *See* the discussion with regard to the "public trust" theory at pp. 67–68 *infra.*

8. *See, e. g.,* Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

9. Kovacs v. Cooper, 336 U.S. 77, 96, 69 S.Ct. 448, 458, 93 L.Ed. 513 (Frankfurter, concurring) (1949).

Regulations which are designed to make the system function effectively may have an adverse impact on a particular individual's rights. But abridgement of individual rights may be tolerated only when in the long run it enhances the right of the public to receive access to the marketplace of diverse views. Obviously this requires a delicate balancing: any harm to private rights must be outweighed by benefit to the public.[10]

This balancing process has been applied to regulation of the broadcast industry,[11] although in its infancy radio enjoyed the same freedom as the printed press: that is, "anyone who will may transmit."[12] The 1912 Radio Act gave no discretion to the Secretary of Commerce in the granting of broadcast licenses.[13] But by the 1920s the number of broadcasters had increased so dramatically that every "channel" was occupied by at least one station, some by several. The resulting chaos "shook the broadcasting world and left an indelible impression of the dangers of non-regulation."[14]

By 1927 it had become clear that private over-use of the airwaves threatened the public's right to listen to what was being said. "With everybody on the air, nobody could be heard."[15] Some conditions had to be set by Congress to restrict use of the broadcast medium—conditions which *created* the scarcity of the resource which has come to be the outstanding characteristic of the industry.[16]

10. The Supreme Court in *Red Lion* stated that while neither interest cancelled out the other, the public's must be paramount. 395 U.S. at 389–390, 89 S.Ct. 1794. Professor Emerson states that in this area of regulation the test "must be framed in terms of accommodation of interests *within* the system . . . ." (emphasis added) Emerson at 629.

11. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. at 375, 386–390, 89 S.Ct. 1794. Congress specifically provided in § 326 that the FCC could not "interfere with the right of free speech by means of radio communication."
 § 326. Censorship.
 Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.
 The Commission recognized this balancing in its 1949 Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1257:
 Any regulation of radio, especially a system of limited licensees, is in a real sense an abridgement of the inherent freedom of persons to express themselves by means of radio communication. It is, however, a necessary and constitutional abridgement in order to prevent chaotic interference from destroying the great potential of this medium for public enlightenment and entertainment.

12. Remarks of Congressman White during debates on the Radio Act of 1927. 67 Cong.Rec. 5479 (1926). For the early history of radio regulation, *see* 1 A. Socolow, The Law of Radio Broadcasting 38–61 (1939); H. Warner, Radio & Television Law 757 et seq. (1948); National Broadcasting Co. v. United States, 319 U.S. 190, 210–213, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

13. *See* Socolow, *supra* note 12 at 38; Warner, *supra* note 12, at 757 et seq.

14. Kalven, Broadcasting, Public Policy & The First Amendment, 10 Journal Law & Economics 15, 25 (1967).

15. National Broadcasting Co. v. F.C.C., 319 U.S. 190, 212, 63 S.Ct. 997, 1008, 87 L.Ed. 1344 (1943).

16. *Accord*, Red Lion Broadcasting Co. v. F.C.C., 395 U.S. at 388, 89 S.Ct. at 1805:
 . . . the chaos which ensued from permitting anyone to use any frequency at whatever power level he wished, . . . made necessary the enactment of the Radio Act of 1927 and the Communications Act of 1934, as the Court has noted at length before. . . . It was this reality which at the very least necessitated first the division of the radio spectrum into portions reserved respectively for public broadcasting and for other important radio uses such as amateur operation, aircraft, police, defense, and naviga-

Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation. Because it cannot be used by all, some who wish to use it must be denied.[17]

Only because *private* rights of access to the air had to be limited, was it feared that the *public's* right of access to a robust marketplace of ideas would be endangered.[18] Congress authorized the newly-created Commission to insure that broadcasters operate "in the public interest"—a duty which had never been imposed on the printed media. But Congress did "not license the Commission to scan the airwaves for offensive material with no more discriminating a lens than the 'public interest'."[19] Each new form of regulation which departed from the

strict "hands-off" policy ordered by the First Amendment required a careful balancing of private vs. public rights in light of the paramount goal of a marketplace of ideas.

Many reasons have been given for the regulation of broadcasting.[20] But behind all formulations lies the simple fact that a broadcast license is a scarce resource. Regulation by government cannot, under the First Amendment, be divorced from the threat to the marketplace posed by the *unique* characteristic of scarcity. The temptation is, however, to rely on familiar formulas to justify new regulations, even where they may not be justified by the First Amendment test.

For instance, it is often stated as a foregone conclusion that a "broadcast license is a public trust subject to termination for breach of duty", [21] and thus

---

tion; and then the subdivision of each portion, and assignment of specific frequencies to individual users or groups of users. Beyond this, however, because the frequencies reserved for public broadcasting were limited in number, it was essential for the Government to tell some applicants that they could not broadcast at all because there was room for only a few.

17. National Broadcasting Co. v. F.C.C., 319 U.S. 190, 226, 63 S.Ct. 997, 1014 (1943).

18. National Broadcasting Co. v. F.C.C., 319 U.S. at 213, 63 S.Ct. at 1008:
 The plight into which radio fell prior to 1927 was attributable to certain basic facts about radio as a means of communication—its facilities are limited: they are not available to all who may wish to use them; the radio spectrum simply is not large enough to accommodate everybody. There is a fixed natural limitation upon the number of stations that can operate without interfering with one another. Regulation of radio was therefore as vital to its development as traffic control was to the development of the automobile.

19. Banzhaf v. F.C.C., 132 U.S.App.D.C. 14, 31, 405 F.2d 1082, 1099 (1968), cert. denied, American Broadcasting Companies v. F.C.C., 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

20. For a critical discussion of the justifications for regulation of the broadcast industry *see* Robinson, Observations on 40 years of Radio and Television Regulation, 52 Minn.L.Rev. 67 (1967); Note, Concepts of the Broadcast Media Under the First Amendment: A Reevaluation and a Proposal, 47 N.Y.U.L.Rev. 83 (1972); for a contrasting view see Barrow, The Equal Opportunities and Fairness Doctrines: Pillars in the Forum of Democracy, 37 Cin.L.Rev. 447 (1968).

21. Office of Communication of United Church of Christ v. F.C.C., 123 U.S. App.D.C. 328, 337, 359 F.2d 994, 1003 (1966). *See* The Fairness Doctrine and Other Issues, Report of the Special Subcommittee on Interstate and Foreign Commerce, House of Representatives, p. 1, May 9, 1969:
 Broadcast regulation has, from its inception, been based on the premise that the airwaves belong to the people, licensed to be used in the public interest, convenience and necessity.
 Robinson, *supra* note 20, comments at p. 152:
 Little effort has ever been made to look beneath the superficiality of the concept of public ownership of the broadcast spectrum to determine whether it has any practical logic or meaning. Logically the concept is meaningless. To say that the airways or spectrum can be owned by anyone is simply

that the public may attach whatever conditions it believes necessary to protect its interest. Certainly government might claim ownership of the airwaves, just as it has claimed ownership of parks and streets and postal facilities, for the public good. But it cannot, unlike a private owner, place restraints upon the First Amendment rights of those who use this property simply by declaring "I own it." The very fact of public ownership or control brings into play the First Amendment, which requires that governmental authority may not be used in and of itself to justify deprivation of freedoms of speech and press.[22] Were it otherwise, these constitutional protections would fall to the caprice of governments.

There is some usefulness in the "public trust" terminology only if it is understood to be derived from technical scarcity in the broadcast industry. To the extent that government can and must impose restrictions upon licensees in order to deal with the problems posed by scarcity, a broadcast licensee is a trustee. But the scope of the trust duties cannot be extended beyond what is required to preserve the marketplace of ideas from the dangers which scarcity may threaten. Thus the term "public trust" expresses the result of a complicated process of constitutional reasoning by a deceptively simple formula. It is a conclusory label dangerously applied without reference to its history or derivation, and has no constitutional weight of its own.

As we have stated before:

First Amendment complaints against FCC regulation of content are not adequately answered by mere recitation of the technically imposed necessity for *some* regulation of broadcasting and the conclusory propositions that "the public owns the airwaves" and the broadcast license is a "revocable privilege". It may well be that some venerable FCC policies cannot withstand constitutional scrutiny in the light of contemporary understanding of the First Amendment and the modern proliferation of broadcasting outlets.[23]

to indulge in fantasy. Surely no one seriously supposes that the airways are a thing of nature which can be possessed, occupied, or used in any normal sense of the word. In actuality, "airways" is merely convenient shorthand, an abstraction for a phenomenon created as a result of the use of privately owned transmission facilities. The "spectrum" is a purely artificial construct of the Commission itself. To give this construct an independent nature and then attempt to justify the regulation itself in those terms is entirely circular. It is like saying that the Commission owns the frequencies because it has the power to regulate their use, and that it has the power to regulate their use because it owns them.

22. Banzhaf v. F.C.C., *supra* note 19, 132 U.S.App.D.C. at 42, 405 F.2d at 1100.
It has often been argued that the government *could have* assumed total control of the broadcasting medium, but this theory
fails to come to grips with the real issues. It could equally well be said that the public "owns" the streets and parks, and that consequently individuals have no right to use them for purposes of expression except on the government's own terms. Moreover, the problem is not solved simply by bringing into the picture the doctrine of unconstitutional conditions—that if the government extends the privilege of using the airways to private individuals or groups it cannot attach conditions that violate the First Amendment. Surely the affirmative power of the First Amendment demands that the government make available for general use, as a constitutional right, the most significant medium in our whole system of freedom of expression. The government cannot maintain a monopoly of the airways any more than it can maintain a monopoly of the streets, or of printing presses. Starting from this point, then, the First Amendment issues begin to grow far more complex than the "public ownership" theory envisages.
Emerson at 660–61.

23. Banzhaf v. F.C.C., *supra* note 19, 132 U.S.App.D.C. at 32, 402 F.2d at 1100.

## II.

Brandywine's First Amendment complaints require that the fairness doctrine be subjected to constitutional scrutiny far more searching than either the Commission or my Brother Tamm provides. The FCC, fresh from its vindication in *Red Lion,* focused only on whether WXUR had in fact violated certain fairness obligations.[24] Judge Tamm also relied on *Red Lion* to set the constitutional balance in favor of a fairness doctrine: if fairness obligations *could* constitutionally be imposed, the imposition *must* be constitutional in this case.[25]

But the facts cry out otherwise. WXUR was no doubt devoted to a particular religious and political philosophy; but it was also a radio station devoted to speaking out and stirring debate on controversial issues.[26] The station was purchased by Faith Theological Seminary to propagate a viewpoint which was not being heard in the greater Philadelphia area. The record is clear that through its interview and call-in shows it *did* offer a variety of opinions on a broad range of public issues; and that it never refused to lend its broadcast facilities to spokesmen of conflicting viewpoints.[27]

The Commission's strict rendering of fairness requirements, as developed in its decision,[28] has removed WXUR from

24. In its July Decision the Commission noted: "At the heart of this proceeding is the question of compliance with the Fairness Doctrine." 24 F.C.C.2d 18, 21 (1970). In the February Decision, the Commission carried its analysis of Brandywine's constitutional claims no further than *Red Lion.* The FCC sidestepped the issue of whether its action carried an adverse First Amendment impact by stating that since its "decision was based solely upon fairness concepts whose constitutional validity has been sustained by the Supreme Court . . . [t]here is no constitutional infirmity." 27 F.C.C. 2d 565, 566 (1971).

25. Judge Tamm noted, of course, that the Supreme Court "found that the Commission's application of the fairness doctrine" was constitutional because it "enhances rather than abridges the freedoms of speech and press." 153 U.S.App.D.C. at ——, 473 F.2d at 57. But this conclusion was not supported by any analysis of whether the result in this case actually enhanced these freedoms. There was only a bare assertion that WXUR was guilty of attempting to silence and censor the public—a verdict which did not originate with the FCC.

26. The Hearing Examiner in this case concluded that WXUR "has presented such discussion in about the same degree as most stations offer entertainment." 24 F.C.C.2d 42, 131 (1970) (Issued Dec. 10, 1968).

27. As the Hearing Examiner noted, "[t]here was an attempt, however inept, to allow wide-swinging utterance of all shades of thought. This met the first mandate of the Fairness Doctrine calling for broadcast of divergent viewpoints but it ran head-on into the second commandment of protecting persons and groups against attacks." 24 F.C.C.2d at 135. He also concluded:

> With so many viewpoints having been expressed over WXUR on so many different issues, it would be futile to attempt any conclusion in terms of equating the time given to each. Fortunately the Fairness Doctrine does not demand this kind of approach. What it does demand is an honest and good faith effort by the licensee to air contrasting, conflicting and varying attitudes towards subjects of important controversy. In the broad perspective of this record, it is almost inconceivable that any station could have broadcast more variegated opinions upon so many issues than WXUR. 24 F.C.C.2d at 130.

28. The FCC re-examined tapes of two weeks of Brandywine's programming and found that these established a *prima facie* violation of the fairness doctrine, since while Brandywine presented one side of numerous issues, it presented opposing views on only one issue. To override this *prima facie* showing, Brandywine was required to prove that it had established an acceptable procedure for complying with the doctrine. *See* Office of Communication of United Church of Christ v. F.C.C., 138 U.S.App.D.C. 112, 425 F.2d 543 (1969). The Commission narrowly defined what would be acceptable—a regular procedure for previewing, monitoring or reviewing its broadcasts; a showing of public announcements inviting the presentation of contrasting views; or

the air. This has deprived the listening public not only of a viewpoint but also of robust debate on innumerable controversial issues. It is beyond dispute that the public has *lost* access to information and ideas. This is not a loss to be taken lightly, however unpopular or disruptive we might judge these ideas to be.

Furthermore, even if WXUR had not been removed from the air but simply ordered to comply with the FCC's ruling, the effect would have been strangulation. There was testimony that the monitoring procedures which the FCC required for identification of controversial issues are beyond the capacity of a small staff, or a shoestring operation.[29] The ratio of "reply time" required for every issue discussed would have forced WXUR to censor its views—to decrease the number of issues it discussed, or to decrease the intensity of its presentation. The ramifications of this chilling effect will be felt by every broadcaster who simply has a lot to say.[30] Thus the result in this case, and the rules it establishes, seem to move us a step back-

wards, away from the First Amendment's marketplace ideal, in the name of the fairness doctrine.

When we see what is being lost as the result of a single blow of this doctrinal sledgehammer, I can only assume that the FCC must be relying on the assumption that the public interest will be served in the *long run* through strict enforcement of the doctrine.

What troubles me most is that the FCC and Judge Tamm apparently see no need to question this underlying assumption. The FCC is perhaps too busy applying and enforcing what it sees to be the necessities of the fairness doctrine theory. But I think the time is overripe to take our blinders off and look further toward First Amendment goals than the next regulatory step which the FCC urges us to take in the name of fairness. Ease of administration is of no weight in this field where precious constitutional freedoms hang in the balance.

Nor can we simply hang our hats on *Red Lion* and relax. The Supreme Court deliberately withheld its approval

---

other adequate action to encourage response to specific broadcasts.

Brandywine's methods of compliance—call-in and interview shows—were unacceptable to the Commission by their very nature, since callers or speakers were not pre-selected or required to speak on specific and isolated issues.

Brandywine did show in its petition for rehearing that conflicting and contrasting views had been aired, albeit fortuitously, on its programs outside the two-week taped period. But the FCC countered this showing with the argument that since the Commissioners had no way of knowing how *often* Brandywine's own views were expressed outside the two-week period, they could not determine whether a "reasonable ratio" of Brandywine's time had been devoted to opposing views. The Commission concluded that the station must have failed to "carry opposing views in any fair ratio" on the basis of the two weeks of tapes.

It may well be that Brandywine did not meet the stringent standards set by the Commission for this case. But whether these standards find any support in judicial discussion of justifications for the fairness doctrine is entirely another matter.

**29.** If shoestring operations cannot afford to operate under FCC rules, we face very critical First Amendment questions indeed.

**30.** The FCC expects each licensee to catalogue each issue it discusses, and requires that it offer a "fair" ratio of opposing views on every issue. 24 F.C.C.2d at 567–69. *See* note 28, *supra.* Silencing WXUR because of infractions of these requirements could, in the words of the Hearing Examiner, "result in silencing all controversial discussion on American radio and television . . . or . . . that discussion would henceforth be a diluted parlor chat in which such restraint was exercised that the outcome would be insufferably dull and totally unenlightening." Hearing Examiner Opinion, 24 F.C.C.2d at 134.

The broadcaster who makes the greater effort to serve the public interest by stimulating robust discussion incurs the further burden of presenting the countering views of his fellow broadcasters who have refused to speak out. All of this places an inordinate burden on the small off-beat broadcaster whose every opinion requires contrasting viewpoints from all quarters.

of all other aspects of the fairness doctrine, and even of further applications of the very rules it was in general approving.[31] The constitutional validity of each and every application of the doctrine must be tested on its own, on a case-by-case basis.[32] We must not be guilty of pouring concrete around foundation of a doctrine which enhances the public's right of access in some circumstances but abridges that right in others.

The theory of the fairness doctrine—that the paramount right of the public under the First Amendment can only be achieved by limiting the rights of individuals so that everybody talks about everything from every point of view—has rested for so long on so many assumptions that any alternative is now hard to imagine.[33] But the logic which alone can justify silencing WXUR requires that this theory be re-examined in light of the narrow constitutional test outlined in Part I above.

III.

The fairness doctrine is a venerable FCC policy which originated in an era when our fears about the effects of scarcity on the public's right of access far outweighed what we understood would be the doctrine's *minimal* encroachment on private First Amendment freedoms. In fact, our belief that government could beneficently regulate a *communications medium* within the confines of the First Amendment can only be understood in its historical context.

At the turn of the century, there were doubts about whether the First Amendment even applied to radio. After all, radio came into the world as a magic box analogized to the telegraph.[34] In

31. 395 U.S. at 396, 89 S.Ct. 1794, 1810. The precise holding of *Red Lion* is as follows: "The Congress and the Commission do not violate the First Amendment when they require a radio or television station to give reply time to answer personal attacks and political editorials." *Ibid.* What seems to be forgotten is that both the *Red Lion* and *RTNDA* litigations involved application of principles by the Commission; that in neither case were sanctions imposed or even threatened. In neither case was there an evidentiary hearing. As the Hearing Examiner recognized, "[t]here is a valid distinction between a broad statement of principle and its specific application to a factual situation. To apply the principle in such a way as to defeat its very purpose would manifestly be an injustice. . . ." 24 F.C.C.2d at 133–34.

32. As we said in Banzhaf v. F.C.C., *supra* note 19, 132 U.S.App.D.C. at 43, 405 F.2d at 1101:
 [W]e are not obliged simply to "invalidate the entire course of broadcasting development" with no inquiry into the particulars of the ruling before us. Rather, we think the proper approach to the difficult First Amendment issues petitioners raise is to consider them in the context of individual regulatory policies and practices on a case-by-case basis.

For example, in Green v. F.C.C., 144 U.S.App.D.C. 353, 359, 447 F.2d 323, 329 (1971), we found that strict adherence to fairness obligations might not be necessary if the issue involved was one over which there was already intense debate in all forms of media:
 In our view, the essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that *the American public must not be left uninformed.* On the record of this case, no matter how the issue is taken, we cannot conceive that any live American has been left uninformed about the desirability or undesirability of military service, the draft, or the Vietnam war.

33. That alternatives to fairness obligations may once have enjoyed a fierce vitality is discussed in note 46, *infra.* That alternatives may be open for current exploration is discussed *infra.*

34. *See* Warner, *supra* note 12, at 757. Remarks of Senator Dill during debates on Radio Act of 1927. 67 Cong.Rec. 12502 (1926):
 Mr. Dill. I will say to the Senator that I think Congress has a right to act and control these stations, even though the broadcasting of entertainment programs is not in itself interstate commerce, for the reason that undoubtedly wireless telegraph messages are interstate commerce, and in order to protect the broadcasting of the point-to-point telegrams,

1912, broadcasting was an "undisclosed art." [35] By 1927 the magic box was a household word, but it still held no legitimacy as press. Rather, radio was entertainment, and it was then perhaps justifiable to ask what entertainment had to do with the First Amendment. In 1928 the Radio Commission had this to say:

> . . . The Commission is unable to see that the guaranty of freedom of speech has anything to do with entertainment programs as such. Since there are only a limited number of channels and since an excessive number of stations desire to broadcast over these channels, the commission believes it is entitled to consider the program service of the various applicants, to compare them and to favor those which render the best service. Second Annual Report of F.R.C. 160 (1928).

The Commission's notion that entertainment was divorced from the First Amendment was not inaccurate in 1928. The Supreme Court had in 1915 upheld a state statute establishing censorship of motion picture films.[36] Not until 1952 did the Court establish that movies were within the protection of the First Amendment.[37] Early court decisions affirming the power of the Commission to regulate on the basis of programming were grounded on the established power of Congress to regulate commerce and gave short shrift to the First Amendment by today's standards.[38]

Broadcasters themselves were viewed as entertainers rather than responsible journalists; certainly they were not "newsmen". The Commission felt justified in imposing upon these neophytes a series of obligations to insure that they would act "responsibly" in the public interest. In 1941 the Federal Communications Commission determined that broadcasters could not editorialize.[39] In 1949 the Commission reversed itself and required that broadcasters *must* edi-

of the shore stations to the ships, and other uses, such as transoceanic, the Government must also control the broadcasting of matter that might not per se be interstate commerce.

35. Warner, *supra* note 12, at 758. Davis, Law of Radio Communication 33-34 (1927) :
Something of the opinion as to the value of radio at that time may be gathered from the testimony of a high naval officer before the House Committee, who said: "Generally speaking, however, the department believes that wireless communication should be limited as far as possible to its legitimate field; that is, communication between the share and vessels at sea."

36. Mutual Film Corp. v. Industrial Commission of Ohio, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed 552 (1915).

37. Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

38. *See, e. g.*, Trinity Methodist Church v. F.R.C., 61 App.D.C. 311, 62 F.2d 850. If it be considered that one in possession of a permit to broadcast in interstate commerce may, without let or hindrance from any source, use these facilities, reaching out, as they do, from one corner of the country to the other,

to obstruct the administration of justice, offend the religious susceptibilities of thousands, inspire political distrust and civic discord, or offend youth and innocence by the free use of words suggestive of sexual immorality, and be answerable for slander only at the instance of the one offended, then this great science, instead of a boon, will become a scourge, and the nation a theater for the display of individual passions and the collision of personal interests. This is neither censorship nor previous restraint, nor is it a whittling away of the rights guaranteed by the First Amendment, or an impairment of their free exercise.

39. Mayflower Broadcasting Corp., 8 F.C.C. 333, 339-340 (1941) :
. . . under the American system of broadcasting it is clear that responsibility for the conduct of a broadcast station must rest initially with the broadcaster. It is equally clear that with the limitations in frequencies inherent in the nature of radio, the public interest can never be served by a dedication of any broadcast facility to the support of his own partisan ends. Radio can serve as an instrument of democracy only when devoted to the communication of information and ex-

torialize.[40] In each case, of course, the the Commission was motivated by a peculiar distrust of broadcast journalists as opposed to those who reported in print. "News" was still the business of newspapers.

Today we have arrived at different constitutional definitions as to what is protected speech.[41] Certainly, broadcasting is included.[42] But perhaps more significant is the fact that most Americans now consider television and radio to be their most important news source.[43] Broadcast journalists have grown up.

They see it as in their interest to be guided by the same professional standards of "fairness" as the printed press.[44] There is no factual basis for continuing to distinguish the printed from the electronic press as the true news media.

Our fears of an unregulated broadcast industry in 1927 did focus on the scarcity of the resource. It was argued that the limited facilities would make it a natural monopoly, in distinct contrast with the flourishing competition among printed media.[45] It was feared that the

change of ideas fairly and objectively presented. A truly free radio cannot be used to advocate the causes of the licensee. It cannot be used to support the candidacies of his friends. It cannot be devoted to the support of principles he happens to regard most favorably. In brief, the broadcaster cannot be an advocate.

40. *See* In Re Matter of Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949), where the Commission set forth dual obligations for broadcast licensees: to speak out on controversial issues while giving the opportunity for contrasting views. "There is a twofold duty laid down by the FCC's decisions and described by the 1949 Report on Editorializing by Broadcast Licensees, . . . The broadcaster must give adequate coverage to public issues, United Broadcasting Co. . . . and coverage must be fair in that it accurately reflects the opposing views." Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 377, 89 S.Ct. 1794, 1800, 23 L.Ed.2d 371 (1969).

41. *See, e. g.*, New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

42. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. at 386, 89 S.Ct. 1794; United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

43. An Extended View of Public Attitudes Toward Television and Other Mass Media, 1959–1971, Report by the Roper Organization, Inc. p. 2, June, 1971.

44. Testimony of Bill Monroe, Correspondent, NBC News, Feb. 2, 1972, before the Subcommittee on Constitutional Rights of the Committee on the Judiciary of the United States Senate:

The fantastic new technology and sudden impact of television may have misled us about its most vital function. Seeking to fit it into familiar cate-

gories, some of us have been impressed with the size and wealth of television, and have put it down simply as big business. Some of us have been impressed with its evening parade of singers, dancers, actors, and comedians, and have put it down as the new vaudeville. But those nervous pictures that bring the White House, Capitol Hill, Vietnam and London into our living rooms don't strike us immediately as the new front page. So we have missed the main fact about television: it *is* press. And if television and radio spend more time on entertainment and commercials than on news, so, in fact, do many newspapers with their acres of advertising, their sports pages, gossips, astrologists, advice to the loveless and fat Sunday editions with the news tucked inside the colors of Dick Tracy and Peanuts. Radio and television are, at bottom, instantaneous, warm-blooded press. Like the printed press, they carry the flesh of commerce and entertainment on a hard skeleton of news. And, like the printed press, they *are* massively engaged in exactly that kind of communication which the First Amendment was written to protect.

Adress by Julian Goodman, President, National Broadcasting Company at "Great Issues. Forum," University of Southern California, Oct. 11, 1972:

For fairness is a proper journalistic standard, and responsible journalists— in broadcasting and in print—follow it. But when it becomes a government standard, it moves government officials into newsrooms and seats them as judges of how broadcast news and information should be presented.

45. *See, e. g.*, Remarks of Senator Howell, during debates on Radio Act of 1927. 67 Cong.Rec. at 12503 (1926):

Are we to consent to the building up of a great publicity vehicle and allow it to be controlled by a few men, and em-

effects of this monopoly would be to silence a diversity of opinion, so the Commission determined that diversity would be enforced by governmental regulations. Some of these took the form of ownership and network restrictions, but these efforts remained largely incomplete.[46] So the fairness doctrine focused on the responsibility of each "monopolist" to present views in contrast with his own so that the public would not be misled.[47]

> power those men to determine what the pubic shall hear. . . .
> It may be urged that we do that with the newspapers. Yes, but anyone is at liberty to start a newspaper and reply. Not so with a broadcasting station. However, there are only about 500 who are allowed the privilege of conducting broadcasting stations, and there are not as many broadcasting stations as there are fingers on one of my hands—not more than that—that have the privilege of covering the entire United States.

46. *E. g.*, the Commission's Chain Broadcasting Regulations which undertook to regulate the relations of individual broadcasting stations to the networks. *See* National Broadcasting Co. v. F.C.C., 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Other FCC rules limit the number of stations one enterprise may own under common ownership or under common control. *See, e. g.*, 47 C.F.R. § 73.35 (AM), .240 (FM), .636 (TV) (1967). Clarksburg Pub. Co. v. F.C.C., 96 U.S.App.D.C. 211, 225 F.2d 511 (1955). For a brief discussion of some of these rules *see* Robinson, *supra* note 20, at 73 et seq.

These and other policies such as the anti-trust laws sought to promote a diversity in broadcasting by preventing monopoly control. But economic concentration has always remained a problem in the radio and television industries. See Barrow Report, House Comm. on Interstate and Foreign Commerce, Report on Network Broadcasting, H.R.Rep. No.1297, 85 Cong., 1st Sess. (1958).

The Commission's acquiescence in trafficking in licenses reveals the extent to which the private marketplace prevailed over the terminology of "public trust" or concern for the public interest. We did not follow the logic of this economic theory of regulation to its limits. We allowed newspapers to acquire broadcast stations; we allowed networks to expand as much as they have. Whether or not serious pursuit of an open economic marketplace would have enhanced sufficiently the marketplace of ideas cannot today be resolved; certainly it would have been a step in the right direction.

And it may yet be an option we should consider for the future. It suggests, as well, that, unless checked, cable T.V. will suffer the same consequences. "Newspapers and other communications media also began to buy in so that half of the cable systems in the United States are now owned by other media and communications interests." Smith, The Wired Nation 22 (1972).

47. This, according to *Red Lion*, is the primary purpose of the fairness doctrine. 395 U.S. at 377, 89 S.Ct. 1794. The FCC's Editorializing Report of 1949, 13 F.C.C. 1246, 1249, expressed the same point:

> It is axiomatic that one of the most vital questions of mass communication in a democracy is the development of an informed public opinion through the public dissemination of news and ideas concerning the vital public issues of the day. Basically, it is in recognition of the great contribution which radio can make in the advancement of this purpose that portions of the radio spectrum are allocated to that form of radio communications known as radiobroadcasting. Unquestionably, then, the standard of public interest, convenience and necessity as applied to radiobroadcasting must be interpreted in the light of this basic purpose. The Commission has consequently recognized the necessity for licensees to devote a reasonable percentage of their broadcast time to the presentation of news and programs devoted to the consideration and discussion of public issues of interest in the community served by the particular station. And we have recognized, with respect to such programs, the paramount right of the public in a free society to be informed and to have presented to it for acceptance or rejection the different attitudes and viewpoints concerning these vital and often controversial issues which are held by the various groups which make up the community. It is this right of the public to be informed, rather than any right on the part of the Government, any broadcast licensee or any individual member of the public to broadcast his own particular views on

Today, our fears of a broadcasting monopoly seem dated. The number of commercial broadcasting stations on the air as of September, 1972, was 7,458. As of January 1, 1971, daily newspapers totaled only 1,749.[48] Nearly every American city receives a number of different television and radio signals. Radio licensees represent diverse ownership; UHF, local and public broadcasting offer contrast to the three competing networks; neither broadcasting spectrum is completely filled. But out of 1,400 newspaper cities, there are only fifteen left with face-to-face competition.[49]

This is not to say that scarcity is only a problem of the past. In *Red Lion,* the Supreme Court premised its analysis on the reality of the existing limitations of the resource.[50] There are also a variety of new arguments being raised about the lack of access for minority groups which have not yet been dealt with by the Court.[51] But *Red Lion* cannot be read as the final word on scarcity: the cable technology of the future was not even mentioned in the Court's decision.

any matter, which is the foundation stone of the American system of broadcasting.

48. Office of Information, Federal Communications Commission, News Release, Oct. 10, 1972; Editor and Publisher Year Book-1972.

49. B. Bagdikian, The Effete Conspiracy and Other Crimes of the Press 11 (1972).

50. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 396–401, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

51. Access of minority groups to the microphone of mass communication is indeed a serious problem; it is one which exists with respect to newspapers as well as the broadcast media. But the right to hear a countering view does not solve the problem of control of stations or newspapers. In upholding the promulgation of fairness rules in *Red Lien,* "Justice White found the force of the First Amendment to lie in the right of the public to hear, and he ignored the right of the ordinary citizen to use broadcasting facilities to speak." Emerson at 664. The fairness doctrine does not *necessarily* speak to minority rights of access.

Recently, this court determined that broadcast licensees may not, as a general policy, refuse to sell any of its advertising time to groups or individuals wishing to speak out on controversial public issues. Business Executives' Move For Vietnam Peace v. F.C.C., 146 U.S.App. D.C. 181, 450 F.2d 642 (1971), cert. granted Columbia Broadcasting System, Inc. v. Democratic Nat. Committee, 405 U.S. 953, 92 S.Ct. 1174, 31 L.Ed.2d 230 (1972). This case is now before the Supreme Court. While my opinion today might raise some First Amendment questions with respect to *Business Execu-*

*tives' Move For Vietnam Peace,* it may be well to note Judge Wright's statement for this court:

It is particularly important that these cases deal only with the public's First Amendment interests in broadcasters' allocation of advertising time. They deal only with time relinquished by broadcasters to others; petitioners argue only that, in relinquishing that time, broadcasters must not discriminate against protected expression. In normal programming time, closely controlled and ·edited by broadcasters, the constellation of constitutional interests would be substantially different. In news and documentary presentations, for example, the broadcasters' own interests in free speech are very, very strong. . . . The Commission's fairness doctrine properly leaves licensees broad leeway for professional judgment in that area. But in the allocation of advertising time, the broadcasters have no such strong First Amendment interests. *Their* speech is not at issue; rather, all that is at issue is their decision as to which other parties will be given an opportunity to speak.

*Supra,* 146 U.S.App.D.C. at 198, 450 F. 2d at 654.

It also might well be argued that the economic status of the owners of broadcast stations, or the influence of advertisers, make it unlikely that certain opinions will ever be aired. The fairness doctrine approaches this problem from the perspective of regulating how and what the licensee broadcasts. An alternative approach would be the allocation of access time. *See* Red Lion Broadcasting Co. v. F.C.C., 395 U.S. at 390–391, 89 S.Ct. 1794; Emerson at 663.

It is a fact that with *existing equipment and technology* "a single coaxial [tv] cable can carry between 28 and 36 channels of television, plus the entire AM and FM radio bands and a quantity of other non-visual electronic signals." [52] It is predicted that in perhaps 10 years it will be possible to provide to the television viewer 400 channels; [53] that by 1980 half the nation will be on cable television; and that a host of educational and public services will accompany the cable revolution which are simply mind-boggling.[54]

Thus, even now we possess the know-how to do away with technical scarcity through CATV.[55] The costs of laying cable may at *some point* be prohibitive, but this is to say no more than that there may be severe economic limitations to obtaining a cable station—economic limitations which affect the printed media equally severely.[56] Is it not a little ironic that we still adhere to our fears of monopoly and limited access? Ought we not instead focus our attention on how we can make the cable medium economically accessible to those who assert a right to use it? [57]

52. Smith, The Wired Nation 7 (1972).

53. *Id.*

54. *Id.* at 5. *See also* Industrial Electronics Division of the Electronics Industries Association, The Future of Broadband Communications, Oct. 28, 1969. Some of the public services—beyond traditional television—which are predicted include data services, mail delivery, two-way television communication, and a home library service:

 This may be called the *electronic home library service* (designated BCNL). With such a service available a reader can request a book or periodical from a large central library, using a narrow-band channel to the library (a phone circuit or the BCN network itself.) The desired book is then "transmitted" from microfiche, microfilm, or video tape, page by page, and received via the BCN network on a dedicated wide-band channel.
 Several modes of operation are possible. In one, the entire book or selected article is transmitted at the maximum reception speed of the user's facsimile recorder. Several hundred simultaneous transmissions in time-division multiplex are possible with 6–MHz BCN channels and reasonable recorder speed.
 As an alternative, a soft-copy display can be used. Each page is transmitted and stored at the receiver for reading. When the reader has finished one page, he signals for the next page, and this is transmitted in a small fraction of a second with no perceptible delay. This is another form of time sharing of the broad-band channel.
 To get a feeling for the capacity of a broad-band channel, it is of interest to note that in the demonstration described in Reference 5, the entire text of "Gone With the Wind" was transmitted in facsimile over a television microwave circuit in slightly over two minutes.

55. "If more channels are wanted, a second cable can be laid, and a third, and a fourth . . . " Smith, The Wired Nation 7 (1972). *See also* Botein, Access to Cable Television, 57 Corn.L.Rev. 419, 424 (1972); 22 P. & F. Radio Reg.2d 1759, 1761–65 (1971), (Letter from Dean Burch, Chairman, F.C.C., to Subcomm. on Communication of the Senate Comm. on Commerce, p. 1771, August 5, 1971).

56. It appears today that *economic*, not technical, limitations in reality restrict entry into the broadcast market. And as to these, "the economic barriers to entry into radio broadcasting are . . . far less restrictive than in the case of media such as newspapers." Robinson, *supra* note 20, at 88. But of course, the economic basis of scarcity does not yet justify regulation of the content of printed press although anti-trust regulation is accepted, Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

57. In light of the tremendous potential of cable television as a source of information concerning controversial public issues, and in view of its potential for so increasing access to the broadcast media, it is ironic to note that the FCC activity in this area has been characterized as focused, until recently, on protecting the commercial broadcast systems. *See* Robinson, *supra* note 20, at 78–83; Smith, The Wired Nation 45 et seq., (1972). *See generally* Botein, Access to Cable Television, 57 Corn.L.Rev. 419 (1972). Botein, CATV Regulation: A Jumble of Jurisdictions, 45 N.Y.U.L.Rev. 816 (1970); 79 Harv.L.Rev. 366 (1965). There are a wide variety of economic measures which might be taken to pro-

Scarcity raised still another fear in the early days of broadcasting—that of broadcasters, licensed by a Commission of political appointees, who would propagandize political viewpoints and privately censor all opposition.[58] The spur of the fairness doctrine was thus justified as encouraging "fair" discussion of public issues, and the Commission was seen as the even-handed arbiter of "fairness."

Yet we are told today, by highly respected members of the newspaper and broadcasting corps, that governmental regulation of broadcasting has been more pernicious than any group of private censors.[59] Some of the "chilling" effects of the threat of FCC intervention, which the broadcasters say have operated to suppress discussion of controversial views and ambitious journalism, remain hidden from the public eye.[60]

mote the ability of groups and individuals to gain access to both wired and printed media. *See, e. g.*, Emerson at 669; Note, Concepts of the Broadcast Media Under the First Amendment: A Re-evaluation and a Proposal, *supra* note 20.

58. Senator Howell stated during the Congressional debates on the Radio Act of 1927:

Mr. President, to perpetuate in the hands of a comparatively few interests the opportunity of reaching the public by radio and allowing them alone to determine what the public shall and shall not hear is a tremendously dangerous course for Congress to pursue. . . . Are we to consent to the building up of a great publicity vehicle and allow it to be controlled by a few men, and empower those few men to determine what the public shall hear? . . . Facts were brought out before the committee to show that already plans were on foot to buy up and monopolize stations in various areas of the country, and that as high as $100,000 had been paid for the transfer of a broadcasting license; in fact, if I remember correctly, it was intimated that $250,000 was paid in one case. If any public question is to be discussed over the radio, if the affirmative is to be offered, the negative should be allowed upon request also, or neither the affirmative nor the negative should be presented. 67 Cong.Rec. 12503–12504 (1926).

The Congress did not accept proposed provisions regarding the presentation of public issues. Apparently it was thought that the words "public questions" were so vague as to raise more difficulties than the regulation could solve. *Id.*

59. Cronkite, Introduction to Part III: Points of Conflict—Legal Issues Confronting Media Today, 60 Geo.L.J. 1001, 1003–04 (1972); Statement of Bill Monroe, Correspondent, NBC News, Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary of the United States Senate, February 2,

1972; Address by Julian Goodman, President, National Broadcasting Company at "Great Issues Forum", University of Southern California, October 11, 1972.

60. The effect of government's "lifted eyebrow" is discussed by both Goodman and Monroe, *supra* note 59. The problem was noted 15 years ago by Mr. Richard Salant in a speech before the National Association of Broadcasters. Salant explained that following CBS's interview in 1957 with Premier Khruschev, the station was deluged with government criticisms and inquiry.

This puts us on the spot before we even get started. No matter what the laws may say about immunity from censorship and about our entitlement to the guarantees of the First Amendment there is always the brooding omnipresence that a broadcaster is a licensee and if he is not a licensee, he cannot be a broadcaster.

We are reminded of this basic dilemma with rather frightening regularity. Time and time again we are called to account by those who have, directly or indirectly, power of life and death over us. Every time we deal in our news or public affairs broadcasts with a public controversy concerning which there are strongly contending views, we can at least expect letters from legislators, public officials and private citizens representing important organizations who accuse us of partiality and call on us for an accounting—line by line and second by second.

Speech by Richard Salant, Broadcast Licensees and the Freedom of the Press, before National Association of Broadcasters, 1957.

Professor Harry Kalven, after studying CBS's complete file of FCC complaints covering the period from 1960 to 1964, has said about "regulation by dossier":

Think of the outcry if some great daily newspaper were requested by government, and so peremptorily requested,

*Red Lion* dismissed this issue as speculative,[61] but this cannot be the final word. Facts can change, and so can our perception of them.

Some chilling effects have become quite obvious. In the past years, networks have come under repeated attacks from government spokesmen who did not like the way television reported a variety of hot public issues.[62] These attacks did not focus on inaccuracies, but on the "bias" or lack of "fairness" in the presentation. The history of the FCC is itself replete with examples, including Brandywine itself, of the controversial viewpoint being screened out in favor of the dreary blandness of a more acceptable opinion.[63] In the context of broadcasting today, our democratic reliance on a truly informed American public is

to furnish a justification for printing the views of Walter Lippmann! To answer a letter is, to be sure, no great burden. But freedom has in no small part depended on awareness of the difference between doing something as a matter of grace and doing it as a matter of obligation. In the end there are two important aspects of the FCC dossier technique. First, it serves to extend the appearance of control far beyond what rulemaking or formal decisions would suggest, and it does so by a process which is really not public and which is awkward to challenge. Second, as Mr. Salant has pointed up, it serves to create psychologically an atmosphere of surveillance which is destructive of the morale of a free press.

Comments Goodman,

A timid broadcaster who has gone through one or two of these experiences may think twice before he tackles a subject of strong controversy—the kind that the public needs most to know about. It is not that he wants to avoid the obligation to be fair. But he knows that where there is controversy, there are advocates who will turn to the FCC, under the umbrella of the Fairness Doctrine, to obtain a broadcasting voice that may bear no relationship to the interest or newsworthiness of their cause. And once they invoke the government process, the broadcaster knows that he must defend himself from second-guessing that will come not from a specialist in journalism, but by a generalist in the government bureaucracy.

Goodman, *supra* note 59.

61. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. at 392–394, 89 S.Ct. 1794.

62. *See* Press Freedoms Under Pressure, Report of the Twentieth Century Fund Task Force on the Government and the Press (1972). The experience of CBS News with its documentary, "The Selling of the Pentagon", is a case in point. The Chairman of the House Committee on Interstate and Foreign Commerce subpoenaed the president of CBS, directing him to submit "all film, work prints, out-takes, and sound tape recordings, written scripts and/or transcripts utilized in whole or part by CBS in connection with" the documentary. *See also* Address by Vice President Agnew, Midwest Regional Republican Committee Meeting, Des Moines, Iowa, Nov. 13, 1969.

Such criticism and inquiries are not limited to one party or one political philosophy. During the 1972 Presidential campaign, charges of political bias have come from all sides. Goodman, *supra* note 59. What this suggests is that the potential to subject the "fairness" theory to political abuse is inherent in the operation of the doctrine.

Professor Emerson clearly expresses the potentially harmful effects of trying to solve the problems of scarcity and access through governmental policies like the fairness doctrine:

[A]ny effort to solve the broader problems of a monopoly press by forcing newspapers to cover all "newsworthy" events and print all viewpoints, under the watchful eyes of petty public officials, is likely to undermine such independence as the press now shows without achieving any real diversity.

Emerson at 671

His conclusion that such efforts will or *can* work vis a vis radio and television is based solely on the argument of tradition—that government is involved with radio and TV so it must be all right. *Id.* at 665, 668. With all respect to Professor Emerson, this is a distinction without a difference.

63. *See, e. g.,* Lamar Life Broadcasting Co., 38 F.C.C. 143 (1965), reversed for hearing, United Church of Christ v. F.C.C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966) ; Palmetto Broadcasting Co., 23 P. & F. Radio Reg. 483 (1962), aff'd sub nom. Robinson v. F.C.C., 118 U.S. App.D.C. 144, 334 F.2d 534 (1964) ; Trinity Methodist Church v. F. R. C., 61 App.D.C. 311, 62 F.2d 850 (1932).

threatened if the overall effect of the fairness doctrine is the very censorship of controversy which it was promulgated to overcome.

A final word on the crucial impact of the broadcasting media. Early in the history of regulation the fear was expressed that broadcasting might be dangerous because of its unique potential for influence and control.[64] And Judge Tamm seems to warn that because we are "shifting our emphasis from the printed media to the electronic media" the need for governmental regulation has grown greater. Often it is difficult to unravel this argument from fear of monopoly control. But we must be careful to meet it head on, for rightly or wrongly it has become an unexamined prescription for all sorts of government regulation.

There is no doubt about the unique impact of radio and television.[65] But this fact alone does not justify governmental regulation. In fact, quite the contrary. We should recall that the printed press was the *only* medium of mass communication in the early days of the Republic—and yet this did not deter our predecessors from passing the First Amendment to prohibit abridgment of its freedoms. If, as has been suggested, we are to focus on the newly acquired role of broadcasting as the 20th century version of the 18th century town meeting or political pamphlet, we must be all the more careful to preserve a "free press" in the broadcast media. To argue that a more effective press requires a more regulated press flies in the face of what history has taught us about the values and purposes of protecting the individual's freedom of speech.

## IV.

We once stated that "[i]f the fairness doctrine cannot withstand First Amendment scrutiny, the reason is that to insure a *balanced* presentation of controversial issues may be to insure no presentation, or no vigorous presentation, at all." [66] An examination of the facts of this case and the history of regulation which has brought us here raise for me serious doubts about the correctness of continuing to rely primarily on the fairness doctrine as the proper means of insuring First Amendment goals. The plain truth is that to uphold the Commission's fairness ruling, not only must we bless again the road we have travelled in the past, we must go farther; for this will be the first time that the FCC has denied a license renewal because of fairness doctrine obligations.[67]

Whether in this case the Commission has simply taken the doctrine too far or applied it too rigidly, or whether the trouble lies deeper, cannot be determined without a remand. Even now the FCC has begun a long inquiry into a question we face here: Do fairness policies truly promote a marketplace of uninhibited, wide and robust debate? [68] It is proper that this court urge the Commission to

---

64. *See, e. g.,* comment of Senator Howell, *supra* note 58.

65. It has been said that the average family has its television turned on for nearly six hours out of every day. National Association of Broadcasters, Television and the Wired City, A Study of the Implications of a Change in the Mode of Transmission 113 (1968). Clearly the impact, and audience, of the nightly news is far greater than any one paper or magazine. Furthermore, most Americans are apt to believe a story they get from television or radio over magazines or newspapers. An Extended View of Public Attitudes Toward Television and Other Mass Media 1959–1971, A Report by The Roper Organization, Inc. 1971.

66. Banzhaf v. F.C.C., *supra* note 19, 132 U.S.App.D.C. at 34–35, 405 F.2d at 1102–1103.

67. Cox, Does the FCC Really Do Anything?, 11 J. Broadcasting 97, 104 (1967) ; Note, The Fairness Doctrine and Broadcast License Renewals: Brandywine-Main Line Radio, Inc., 71 Col.L.Rev. 452, 458 (1971).

68. In re The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 30 F.C.C.2d 26 (1971).

reconsider this case in light of its fairness hearings; that we encourage the Commission to draw back and consider whether time and technology have so eroded the necessity for governmental imposition of fairness obligations that the doctrine has come to defeat its purposes in a variety of circumstances; that we ask whether an alternative does not suggest itself—whether, as with printed press, more freedom for the individual broadcaster would enhance, rather than retard, the public's right to a marketplace of ideas.

I originally authorized issuance of the opinions of the court with my concurrence resting on the narrow ledge of Brandywine's misrepresentations under the Supreme Court's ruling in F.C.C. v. WOKO, Inc.[69] But it is abundantly clear that the fairness doctrine is the "central aspect" of this case which even touches the core of the applicability of *WOKO*. I have therefore concluded that the great weight of First Amendment considerations cannot rest on so narrow a ledge.

The point to be made is simply that I had originally thought that the alleged misrepresentation could be considered separately from the other issues in the case. But upon closer consideration, it became clear to me that the subject matter of the so-called "deception"[70] is inextricably bound up in the considerations underlying the fairness doctrine. The Commission found one misrepresentation explicitly concerned Brandywine's efforts to comply with the fairness doctrine. The Commission also found that Brandywine "failed to adhere to its program proposals in other respects which are relevant to the fairness questions in this case." 24 F.C.C.2d at 30. Furthermore, in light of my discussion of the

changing relationship between the First Amendment and broadcasting, there is some question as to what the FCC may constitutionally ask of applicants with respect to programming plans and adherence to fairness obligations. Thus the application of *WOKO* raises constitutional questions which cannot be neatly separated, as I had originally thought.

Fortunately, Justice Jackson provided some precedent for a change of mind when he quoted Baron Bramwell as saying, " 'The matter does not appear to me now as it appears to have appeared to me then.' " McGrath v. Kristensen, 340 U.S. 162, 178, 71 S.Ct. 224, 233, 95 L.Ed. 173 (1950).

I would remand the entire case to be reviewed in light of the matters discussed in this opinion.

J. SKELLY WRIGHT, Circuit Judge, with whom Circuit Judge TAMM concurs, responding:

Since Judge Bazelon's dissent seems to be an attack on the fairness doctrine, in fairness to the reader he should make clear at the outset of his opinion that the court's judgment in this case is not based on the fairness doctrine.

When this court's judgment affirming the Commission in this case came down September 25, 1972, Judge Bazelon joined in that judgment. Now he would dissent from that judgment, apparently because he questions the Commission's reliance on the fairness doctrine in reaching its decision. But the Commission's decision was based on two grounds: (1) alleged violations of the fairness doctrine by the licensee, and (2) deception and misrepresentations made to the Commission by the licensee in obtaining the license. Judge Bazelon

---

69. 329 U.S. 223, 227, 67 S.Ct. 213, 91 L.Ed. 204 (1946).

70. Unlike my Brothers, the FCC *never* characterizes Brandywine's actions as "fraud and deception." Instead the Commission found "there was a substantial failure to inform the Commission fully concerning program plans, and also a

significant departure from an express representation concerning the fair treatment of all religious faiths." 24 F.C.C.2d at 32. The Commission drew the *inference* that these failures were a "conscious course of conduct", in distinct contrast to the explicitly and continuously fraudulent action at issue in *WOKO*.

states in his dissent that he originally concurred in affirming the Commission because of appellant's deception and misrepresentations in obtaining the license in the first place. Now he dismisses that ground as too "narrow a ledge" to rest affirmance of the Commission's action.

As shown in my separate opinion, I rested my concurrence in the court's judgment *solely* on the deception ground. Since Judge Tamm would affirm the Commission on that ground also, that ground, and that ground alone, forms the basis of our judgment. I do not agree that it is too "narrow a ledge." Elementary contract principles teach that when a licensee obtains his license by fraud and deception, that license may be voided by the grantor like any other contract may be set at naught for the same reason. I do not believe that a contract is less voidable for deception in its inception simply because the Government is the party deceived. Indeed, since the public is the loser when the Government is deceived, courts should be more, not less, alert in enforcing primary contracting concepts, particularly those based on simple honesty.

By resting the court's judgment in this case on the narrow contract ground, we avoid plunging into the constitutional "thicket" that· is the fairness doctrine. The fairness doctrine is a tortured constitutional area of the law that, as Judge Bazelon recognizes, is under comprehensive study in rule-making proceedings now being conducted by the Commission. Because of the pendency of this study and because courts should not reach out to decide difficult constitutional issues when a narrow nonconstitutional ground is available for decision, I voted to affirm the Commission's action in this case without reaching the constitutional issues involved in an application of the fairness doctrine. I do not think that deception in obtaining a Government license is too narrow a ledge for voiding that license. The Su-

preme Court flatly so held in F. C. C. v. WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946), and there are no cases holding otherwise.